Koppers Company, Inc. *v.* Brunswick
Corporation, Appellant.

*Alan Bruce Bowden,* with him *Robert L. Frantz,* and *Buchanan, Ingersoll, Rodewald, Kyle & Buerger,* for appellant.

*J. Richard Lauver,* with him *Kirkpatrick, Lockhart, Johnson & Hutchison,* for appellee.

OPINION BY HOFFMAN, J., March 27, 1973:

This is an appeal from a judgment entered in favor of Koppers Company, Inc., the plaintiff below, on August 22, 1972, by the court en banc of Allegheny County. This action involved a suit by Koppers for damages arising out of the breach of a written purchase order (numbered DN16-0243), dated June 15, 1966, between Universal Moulded Fiber Glass Corporation (hereinafter, "Universal") and Brunswick Corporation (hereinafter, "Brunswick"). Universal was subsequently merged by statutory merger into Koppers. The plaintiff was a subcontractor and the defendant a prime contractor on a contract with the United States Government.

The case was tried before a jury on January 17, 1972. After hearing all the testimony, the trial court concluded that the plaintiff had met its burden of proof to establish a right to a verdict and further concluded that there were no factual issues to be resolved by the jury. The court thereupon granted plaintiff's motion for a directed verdict. Post-trial motions were entertained, and thereafter the court sitting en banc denied said motions and enter judgment in favor of the plaintiff in the amount of $72,627.77. It is from that judgment that defendant has appealed to this Court. We have examined the record carefully and studied the

opinion of the court below. We believe that the trial court action was proper.

In 1964, Universal was awarded a contract ("Contract 430") whereby Universal agreed to furnish 115 millimeter rocket containers to the United States Government. In November of 1964, Universal purchased lug fittings, end caps and screws to be used in the production of these rocket containers under Contract 430.

In October of 1965, the Government and Universal agreed to a no-cost termination of Contract 430 for the convenience of the Government. The lugs, caps and screws produced by Universal were not allocated to the 430 contract as termination inventory although they would have been allocable had they been listed. Universal, instead, elected not to charge these items to the 430 contract, but under the agreement with the Government chose to retain these items for its own account.

On March 10, 1966, the Government awarded to the defendant, Brunswick, a contract under which Brunswick was required to supply 35,900 completed rocket containers and 8,847 tubes. A representative of Universal, Mr. York, thereafter met with a representative of Brunswick, advising him that Universal had for sale certain hardware items which were previously acquired under the 430 contract.

On April 27, 1966, representatives of Brunswick visited Universal's plant to inspect the hardware items, and took a number of end cap assemblies to its plant for further inspection. On May 13, 1966, Mr. Wegner of Brunswick called Universal and advised that "the castings assembly checked out O.K." A second shipment of hardware items were subsequently shipped to Brunswick for inspection.

A 24-page purchase order was prepared by Brunswick and forwarded to Universal on June 15, 1966, acceptance of which ratified the incorporation of all the enclosed documents including 3 pages containing pro-

visions of Armed Services Procurement Regulations (hereinafter, "ASPR"). Page 2 of the bold type contained provisions for a unit credit or debit for items shipped either in shortage or in excess of delivery schedule, and also for any parts found to be "non-acceptable parts". Consistent with these bold-type provisions were listed warranties among which included the following: "[G]oods not in accordance therewith may be returned to Seller with Charge for transportation both ways and Purchaser shall have the option of returning such goods to Seller at any time within thirty days after delivery for credit or replacement at the price charged."

The Additional Terms and Conditions attached to Brunswick's Purchase Order provided, inter alia, as follows:

### TERMINATION

Buyer may terminate work under this purchase order in whole or in part at any time by written or telegraphic notice to Seller. Upon notice of such termination to Seller for any reason other than default or delay of Seller (except when due to causes beyond Seller's control and without Seller's fault or negligence), the respective rights and duties of Buyer and Seller shall be as provided in, and settlement shall be made in accordance with the approved Government termination article applicable to the Prime between the Prime Contractor and the United States referred to on the face of this order as said termination article may be amended and in effect as of the date of such notice of termination. All terms of such approved Government termination article shall be deemed to be incorporated herein and made a part hereof by this reference.

Brunswick's Purchase Order, furthermore, incorporates ASPR provisions expressly made applicable to the contract with Universal. Among those provisions

and highly pertinent to the legal issues involved in the instant matter is Section 8-209.1 which provides as follows: "8-209.1 Subcontractor's Rights. A subcontractor has no contractual rights against the Government upon the termination of a prime contract. The rights of a subcontractor are against the prime contractor or immediate subcontractor with whom he has contracted. Upon termination of a prime contract, the prime contractor and each subcontractor are responsible for the prompt settlement of the termination claims of immediate subcontractors."

The detailed specifications attached to the Purchase Order fix specific dimensions for each hardware item. These dimensions are given with certain tolerances. For example, the outside dimension of the milled slot in the rear end cap is given as 4.150 inches, with a tolerance of minus .005 inches; thus any measurement of the slot could vary from 4.145 and 4.150 inches and still meet the specifications. Included in the Purchase Order is the provision that acceptance of the hardware items would be based on a sample inspection plan per Military Standard 105D at an Acceptable Quality Level ("AQL") of 1%. This meant that if a deviation from the tolerances existed in any batch of items certain levels would prompt rejection of defective parts if below a 1% out of tolerance. However, if the out of tolerance level reached 1% or more, the consequences would be that the entire lot or shipment of the particular item would be 100% inspected and all defective items rejected; the remaining items which met specifications could be accepted.

The testimony reveals that Universal conducted its own pre-shipment inspection of the hardware items, and on June 17, 1966, Mr. York of Universal called Mr. Wegner at Brunswick advising him of the results of this inspection. On the same day, a letter confirming this telephone conversation was sent out to Bruns-

wick. This letter stated that from a lot of 20,400 rear end caps certain out of tolerance conditions existed in the rear end caps in the milled slot at the plus .005 and minus .005 levels. This letter further stated that such a degree of nonconformance would cause rejection at a 1% AQL necessitating a 100% inspection of all the rear end caps, and therefore requested Brunswick to obtain a waiver from the Government because the nonconformance could not affect the function of the shipping and firing container.

Two days after the June 17 letter, Brunswick advised Universal by telegram that the original July 13, 1966 shipment date of forward and rear end caps was extended to July 25, 1966. Then on July 19, 1966 and prior to shipment, Universal received the following telegram from Brunswick: "Approval of deviation per your letter of June 17, 1966 not finalized. Hold material until deviation approval has been received by Brunswick and your material released for shipment by formal notification." Although the telegram refers to an alleged request of waiver to the Government in compliance of Universal's suggestion to do so, representatives of Brunswick testified at trial that such a request was never made of the Government. In reliance upon this telegram, Universal did not make the July 25 shipment, even though it allegedly was in a position to do so.

While Universal was awaiting further shipping instructions, Brunswick on September 28, 1966, advised Universal that the Purchase Order was terminated for the following reason: "Our Contract has been terminated by government agency in accordance with provision 27 entitled for convenience of govt. Our PO DN16-0243 shall be terminated in accordance with provisions. Further information to be advised as soon as received from agency." Approximately one week later, on October 5, 1966, Brunswick sent the following letter to Uni-

versal: "Confirming our telegram of September 28, 1966 and in compliance with instructions from the government agency, you are hereby advised that our government contract No. DA-18-035-AMC-00776(A) has been terminated for the convenience of the government.

.  .  .

In order to expedite settlement, kindly submit your settlement proposal to the writer by October 14, 1966. All termination inventories will be accounted for in accordance with ASPR, Section 8, Part 5."

In accordance with the quoted letter, Universal submitted its termination claim to Brunswick and attached a cover letter stating in part that the "material was available for inventory upon notification."

Unknown to Universal, Brunswick began to test the hardware items within a month after it had terminated the Purchase Order under the termination for convenience clause. Mr. Brandt, a Quality Control Engineer for Brunswick, testified that the tests were performed in October, 1966, and that the results were set forth in a memorandum dated October 13, 1966. The tests were performed approximately 6 months after receipt of the hardware items from Universal. This memorandum admitted into evidence at trial disclosed certain defects in summary form. It was admitted by Mr. Brandt that the memorandum was not in normal form and did not describe what tests were made, the manner performed, and the actual results or out of tolerance figures.

Mr. Brandt further testified that it was the custom and practice of the trade that the shipper would be immediately notified of any defect or out of tolerance condition in the product. He stated, however, that no such notice was ever sent to Universal, which in fact did not become aware of the test results until after suit was instituted in 1969. Finally, it was admitted that Universal never received notice of the test results

or notice that Universal was in default in any way under the Purchase Order.

More than six months after the preparation of the October memorandum, on March 17, 1967, Brunswick submitted a settlement proposal to the United States. This proposal included under Schedule F an amount of $73,827.77 on behalf of Universal. This proposal also included the following certificate signed by Mr. Stein, Accounting Manager of Brunswick: "(a) The contractor has examined, or caused to be examined, to an extent it considered adequate in the circumstances, the claims of its immediate subcontractors (exclusive of claims filed against such immediate subcontractors by their subcontractors); (b) *The settlements on account of immediate subcontractors' own charges are fair and reasonable,* said charges are allocable to the terminated portion of this contract *and said settlements were negotiated in good faith* and are not more favorable to its immediate subcontractors than those which the contractor would make if reimbursement by the Government were not involved." (Emphasis added.) The alleged defects in the hardware items were not mentioned in this certificate. On the contrary, Brunswick's own certificate submits that Universal's claim was "fair and reasonable" and that it was "negotiated in good faith". Approximately one year later, on February 6, 1967, Mr. Stein again submitted its settlement proposal to the Government, including Universal's termination claim of $73,827.77, and made the identical certification as that set forth above. This second proposal was also silent on any default by Universal.

On June 8, 1967, Mr. Wegner wrote to Universal and advised that Brunswick was unable to grant Universal its termination claim of $73,827.77. The sole reason given for this refusal was as follows: "As you are aware, an audit of your claim was recently performed by the DCAA. The DCAA audit report indicates

that your inventory claimed is not considered allowable to the terminated purchase order DN16-0243. The report shows that your inventory was acquired and fabricated under prime Contract No. DA-11-035-AMC-430(A) which was settled at no cost to the Government. Therefore, it does not appear that any work was done or that any preparations were made as a result of Purchase Order DN16-0243. As such, the claim does not conform to the requirements of ASPR for allowable termination costs under Contract DA-18-035-AMC-006 (A)."

Almost two years after Universal was advised its claim was disallowed because of ASPR regulations, and before it had any knowledge that Brunswick would claim default as a basis for nonpayment with reliance on the October memorandum showing the hardware items to be defective, Universal sold the hardware for scrap for $1200.[1]

## I. Brunswick's Liability as a Result of Denial of Settlement With the Government.

At trial, defendant argued that because Universal's claim was found to be not allocable by the Government to Brunswick's contract, it was not liable to Universal as well. The lower court denied this contention holding that Universal had the option in termination with the Government of its Contract 430 and to either submit a termination claim proposal or retain the hardware as its own inventory in anticipation of award of a new contract. Universal chose to retain the goods as inventory. When Brunswick was awarded the new contract, Universal disclosed to the representatives of Brunswick

---

[1] It is not disputed by the parties that the hardware items could not be utilized on any other project than the Government's rockets. Being highly precise goods meeting delicate specifications, there was no market for these items. It appears that the $1200 figure was reasonable resale price for the unusable scrap.

that it had this inventory available from the previous contract. It was this fact which was a prime motivation for Brunswick in entering into a subcontract with Universal. Acting with full knowledge of the source of a portion of the delivered hardware, Brunswick could not then use the Government's regulations on allocability to relieve itself of liability to Universal for the sale of these hardware items.

Furthermore, there can be no doubt that Universal had satisfied requirements of the Uniform Commercial Code in identifying and setting aside goods under its contract with Brunswick. The inventory was subject to a firm purchase order by Brunswick, specifically for use in the terminated prime contract. Universal was bound to deliver the hardware for that purpose, and had performed all processing preparatory to shipment. It had identified the end cap inventory to the subcontract within the meaning of the U.C.C. As Section 2-501 (12A P.S. Sec. 2-501) provides, in part: "The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them." Thus, the inventory was properly supplied or furnished or otherwise put at Brunswick's disposal for performance of the terminated contract.

Under the terms of Section 8 of the ASPR, cited supra, the prime contractor was responsible for the settlement of claims with its subcontractors, irrespective of the Government's acceptance of a part or the whole of said contractors' claims.

II. Effect of Brunswick's Failure to Seasonably Inspect Delivered Goods and To Give Notice of Defect.

Brunswick's Purchase Order required Universal to deliver the hardware items by certain specified dates.

The earliest delivery date of the end caps was July 13, 1966, later extended to July 25, 1966. The Purchase Order stated that acceptance by Brunswick would be based on a sample inspection at an AQL of 1%. Brunswick's own witnesses testified that the purpose of the AQL was to find the maximum number of defects which could be found in any given lot before 100% inspection would become necessary. If the AQL was exceeded, Mr. Brandt testified that the material would be sent back to the supplier "for his rework or—for him to replace the material with acceptable material" or "you may present it to your customer, in this case, the Government, for a waiver."

Under the terms of the contract with Universal, Brunswick had three options upon a finding of non-acceptable goods: (1) Brunswick could reject those parts which were "non-acceptable", and get a per unit credit for all such returned goods (This, however, was limited by and extended to Brunswick, by its own deadline, if the goods were returned no more than 30 days after delivery, *supra.*); (2) return the goods to the supplier (Universal) for rework (cure of defects); or, (3) to apply to the Government for a waiver. These options were consistent with governmental provisions and with the U.C.C.

Section 2-601 of the Code provides that "if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit or units and reject the rest." Section 2-602 further states that "[r]ejection of goods must be made within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."

The requirement for affirmative notice of rejection is made clear by the Official Comments to §2-602:

"1. A tender or delivery of goods made pursuant to a contract of sale, even though wholly non-conforming, requires affirmative action by the buyer to avoid acceptance. Under subsection (1), therefore, the buyer is given a reasonable time to notify the seller of his rejection, but without such seasonable notification his rejection is ineffective."

In *Comfort Springs Corp. v. Allancraft Furniture Shop,* 165 Pa. Superior Ct. 303, 307, 67 A. 818 (1949), our Court held that "the buyer's rights to reject goods must be exercised promptly and unequivocally."

Prior to June 15, 1966, the date the contract went into effect, Brunswick had received shipments of goods pertaining to the contract. Furthermore, on July 13, 1966 and again on July 25, the extended date, Universal stood ready to deliver. By its own terms, the "reasonable" time for notice of rejection set by Brunswick was 30 days after delivery or tender. At no time prior to suit did Brunswick "unequivocally" notify Universal of rejection due to non-conforming goods required by *Allancraft,* supra.

The purpose of the notice requirement is explained in §2-508 of the Code which provides: "(1) Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery." The evidence discloses that defendant failed to notify Universal of any default under the purchase order and, therefore, by such failure, deprived Universal of its right to cure under Section 2-508. Under the terms of the Purchase Order, Universal had approximately 6 weeks prior to the first shipment to cure the out of tolerance condition in the rear end caps reported in Universal's letter. Mr. York testified in great detail as to the steps Universal could have taken to correct those defects, if it

had been notified by Brunswick that it was not going to submit a waiver request, but rather exercise its right to demand strict compliance with military specs.

Finally, it was admitted by Brunswick that it conducted no inspection or tests of its own until after termination by the Government in October 1966, some five months after the contact went into effect. Even after those tests were made, Brunswick further admitted not informing Universal of its findings.

When the Government terminated, Brunswick sent a detailed letter for the reason for its termination with Universal, and at no time mentioned the existence of defects as forming reason for default. Its failure to particularize those defects acted as a waiver or renunciation of Brunswick's rights to claim a breach for defective goods. 12A P.S. §2-605.[2]

### III. Estoppel of Defense by Reason of Brunswick's Action and Inaction.

At the moment of reception of Mr. York's letter notifying Brunswick of discovered out of tolerance conditions in the end caps, Brunswick could have inspected and rejected, or taken affirmative action in requiring replacement of goods. It did not. Instead, it chose to do nothing.

Universal, by reason of Brunswick's subsequent telegrams, justifiably believed that Brunswick had submitted its request for waiver of out of tolerance conditions. In fact, no such request was ever forwarded. In reli-

---

[2] We find no merit in defendant's position relating to anticipatory breach. Mr. York's letter did not repudiate but merely asked for a waiver. This request was met with affirmative response by Brunswick in extending the delivery date and advising of its communication of said request to the Government. Such positive action dispels any notion of construing Universal's letter as a repudiation. See Comment to §2-610 of the Code.

ance on those assurances, Universal set back its delivery date until further "formal notification" of waiver. Of course, that notification never came. Instead, the Government opted to terminate for its convenience.

Once the matter had entered the termination phase, Brunswick further demonstrated the immateriality of those defects by both failing to notify Universal of findings from tests conducted in October of 1966 and by failing to notify the Government of the existence of defects. Instead, Brunswick offered as the sole reason for terminating its contract with Universal the termination of the prime contract for convenience. Furthermore, on two occasions, as much as a year after discovering the alleged defects, Brunswick communicated to the Government that Universal's proposal for settlement was "fair and reasonable" and "negotiated in good faith", without the slightest mention of defects.

The overall effect of Brunswick's conduct was to estop defendant from raising any defense of defect on the part of Universal to establish default.

The simple and plain fact is that the termination of the Purchase Order had absolutely nothing to do with any default or failure to perform by Universal. Although Universal stood ready to meet its contractual obligations under the Purchase Order, it did not perform because of the actions of Brunswick. The evidence does not reveal a single instance when Brunswick advised Universal, prior to suit, that it was in default. We must agree with the lower court's conclusion in saying that "[w]e do not see the issue as whether or not there was a defect in the hardware items, as suggested by the defendant. A defect is not synonymous with an event of default and the plaintiff is not required to negate the exclusion of a defect in order to sustain the trial court's directed verdict."

## IV. Right of Resale by Seller.

The verdict in this case took into consideration a credit of $1200 to Brunswick representing the salvage value of the hardware items which were sold for scrap in that amount on April 14, 1969. Brunswick argues that plaintiff was not entitled to the contract price because it sold the items without its consent, and that the amount received was unreasonable.

We have already discussed the question of the reasonableness of the salvage price, taking into consideration the inability to reuse the goods for any purpose, nor to resell them for further use. We, furthermore, dismiss Brunswick's claim that Universal should have asked for the consent of Brunswick before resale.

The U.C.C. specifically provides that in the event that buyer fails to make a payment due on or before delivery the aggrieved seller may "resell and recover damages" where said resale price is less than the contract price. §2-703; §2-706. In the event that the salvage price does not equal the contract price, as in the instant case, the proper remedy is to sue for the difference between the contract price and the resale price. §2-706.

While §2-515 of the Code requires the parties to preserve the evidence of goods in dispute of any claim, it is incumbent upon the party wishing to inspect goods for purpose of ascertaining quantity or quality to give "reasonable notification". As the Comment to this Section points out, "[p]aragraph (a) does not conflict with the provisions on the seller's right to resell rejected goods or the buyer's similar right. Apparent conflict between these provisions which will be suggested in certain circumstances is to be resolved by requiring prompt action by the parties."

The evidence reveals that Universal notified Brunswick that it had the goods ready for shipment and

available for inventory inspection. It was three years between the termination of the prime contract and resale. No stretch of imagination could translate "reasonable notification" into such a length of inaction by Brunswick.

## V. Propriety of the Directed Verdict.

From the overwhelming evidence of the case, a major part of which came from defendant's witnesses themselves, we must agree that the sole issue that remained after the parties had closed their cases and all the testimony had been received was the legal effect of the facts and interpretation of the contract. As our Supreme Court stated in an ancient, but vital case, "[w]here no material facts are in dispute, and the case, in point of law, is clearly with one party or the other, the highest obligation of judicial duty requires a peremptory declaration to that effect." *Koons v. Steele,* 19 Pa. 203, 210 (1852).

Judgment and order of the court below, therefore, affirmed.