**In re ROOSTER, INC., Debtor.**

**ROOSTER, INC., Plaintiff,**

**v.**

**RAPHAEL ROY, S.R.L., Defendant.**

**Bankruptcy No. 89–10737F.**
**Adv. No. 90–0190F.**

United States Bankruptcy Court,
E.D. Pennsylvania.

May 16, 1991.

Douglas N. Candeub, Adelman Lavine Gold and Levin, Philadelphia, Pa., for debtor/plaintiff, Rooster, Inc.

Paul B. Maschmeyer, Ciardi, Fishbone & DiDonato, Philadelphia, Pa., for defendant, Raphael Roy, S.R.L.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

Rooster, Inc. ("Rooster"), the debtor, brought this adversary proceeding against the defendant, Raphael Roy, S.R.L. ("Raphael Roy") to recover two payments made by Rooster to Raphael Roy shortly before Rooster filed a voluntary petition in bank-

ruptcy. Rooster is a Pennsylvania corporation formerly in the business of manufacturing men's neckties. It filed a voluntary petition in bankruptcy under chapter 11 on February 24, 1989. Raphael Roy—a subsidiary of a family business headed by the Giussani family—is an Italian entity in the business of manufacturing silk fabric for distribution to various producers, wholesalers and distributors. Raphael Roy had supplied fabric to Rooster for approximately ten years prior to its bankruptcy filing.

The crux of this dispute stems from a prepetition agreement entered into between the debtor and Raphael Roy. In connection with that agreement, the debtor tendered $22,137.00 to the defendant. The debtor now seeks recovery of that sum under a variety of legal theories. Raphael Roy opposes the relief sought and counters with its own assortment of theories. The various theories of both parties overlap in their discussions of setoff and the provisions of 11 U.S.C. §§ 524(a) and 553.

Without so concluding, I note that both parties consider this proceeding a core proceeding under 28 U.S.C. § 157(b). Whether this proceeding is in fact core, the representation of both parties that it is constitutes consent to my rendering a final judgment under 28 U.S.C. § 157(c)(2). *Accord In re St. Mary Hosp.*, 117 B.R. 125, 131 (Bankr.E.D.Pa.1990). *See 9 Collier on Bankruptcy*, ¶ 7008.03[1], at 7008–8 (15th ed. 1990).

## I.

The following facts were established at trial.

As I noted earlier, the debtor was in the business of selling ties; Raphael Roy was in the business of supplying the material for such ties. Before October 1988, Rooster would order material from the defendant and would be obligated to pay for those goods within 90 days of its delivery. By October 1988, Rooster was indebted to Raphael Roy in the approximate amount of $300,000.00 due to its failure to pay for the fabric after delivery. Rooster was also indebted to other suppliers and feared that it would soon be unable to operate because no supplier would ship additional goods, or because one or more suppliers might attempt to execute on the debtor's assets.

To avoid creditor action and possibly cessation of operations, Rooster attempted to reach a compromise with all or virtually all of its significant creditors, including Raphael Roy. On October 18, 1988, a compromise with this particular creditor was signed. Ex. PX–6. Pursuant to its terms, the debtor agreed to repay its entire obligation to Raphael Roy in six installments over, roughly, a two year period. In return for this promised repayment, Raphael Roy agreed not to take any collection actions.

Furthermore, while this agreement was in force, this supplier agreed that it would sell additional fabric to Rooster. The compromise agreement provides that funds paid by Rooster to Raphael Roy for this new material would not be applied to the unpaid debt. In the event Rooster failed to pay any amount when due in accordance with the terms of the new agreement, however, the parties agreed that Raphael Roy would be free to collect the entire indebtedness owed to it by Rooster.

The agreement also provided that it was not binding on Rooster unless it could reach a similar agreement with at least 90% of its other trade creditors. Apparently, such additional compromises were reached for the debtor tendered to Raphael Roy the first installment payment due October 15, 1988. The second installment was not scheduled for payment until April 15, 1989—which turned out to be due post-bankruptcy—and was not made, nor were any other payments on the outstanding debt tendered.

As already stated, the October 1988 agreement provided that Raphael Roy would sell new fabric to Rooster so long as Rooster now paid for the fabric before delivery. At trial, it was undisputed that this general prepayment provision was quantified by a later oral understanding which established the following schedule for prepayment of any new goods ordered. The debtor promised to tender 10% of the purchase price at the time it placed an order with the defendant. The debtor also

promised to tender an additional 40% of the purchase price when Raphael Roy was ready to begin production of the fabric. The remaining 50% of the purchase price was to be tendered when the supplier was ready to ship the material.

In accordance with this new understanding, Rooster placed four purchase orders with Raphael Roy beginning October 24, 1988 and continuing through November 7, 1988. Exhibits PX–1 through PX–4. The total price for these four orders was $44,272.00. On December 6, 1988, Rooster wire transferred $4,429.00 to Raphael Roy. On January 3, 1989, the debtor sent Raphael Roy an additional $17,708.00, bringing the total prepayment sent to $22,137.00— which is 50% of the four orders—and which is the sum in controversy now.

It is undisputed that Raphael Roy sent invoices to Rooster confirming the purchase orders and stating that the goods would be shipped on February 10, 1989. Thus, February 10, 1989 was the date by which the balance of the purchase price was to be sent. However, Rooster did not tender the balance owed on the goods by that date and, as a result, Raphael Roy did not ship them.

Mr. Egidio Giussani, who is a member of the controlling family which owns and operates the defendant, testified that sometime in March of 1989 Raphael Roy made a further demand upon Rooster for the balance of the payment and received no response. Mr. Richard Aron[1], chairman of Rooster for twelve years, made subsequent efforts to receive the goods ordered in the four purchase orders by both telephoning and writing to Raphael Roy on June 15, 1989 and July 14, 1989 respectively. Exhibit PX–7(a) and (b). Raphael Roy did not respond to either request.[2]

Shortly before this July 1989 letter from Mr. Aron, Raphael Roy had reached an agreement with a Canadian company called Watson Bros. to purchase the fabric ordered by Rooster. That transaction was completed on July 26, 1989 when the goods were shipped and Raphael Roy was paid by Watson Bros.

■ Giussani did not recall the amount of payment received by Watson Bros. as a dollar amount although he did recall that it was greater than the 50% owed by the debtor and less than the original purchase price agreed to by Rooster. N.T. 103–05.[3] Giussani also stated that in selling the fabric to Watson Bros. the defendant incurred between $1,000.00 and $2,000.00 to store the fabric from the time it was ready for shipment in February to the time it was actually sold. He further stated that the defendant "lost" more than $10,000.00 "to make the new screen for Bill Blass for the orders in question." N.T. at 113.[4]

Insofar as the accounting procedures used by the defendant in connection with

---

**1.** Mr. Aron also has been president of M. Aron Corporation for twenty years.

**2.** Much of the testimony offered at the hearing centered on Ex. PX–7(a), which is a letter to Raphael Roy sent by Richard Aron. By the date of this letter, the individuals controlling Raphael Roy were displeased with Mr. Aron. Their displeasure came from the telephone call he made at an earlier date. The letter of July 14, 1989, PX–7(a), is on the stationery of M. Aron Corporation, not the debtor's, and requests an invoice for the balance due and shipment of the ordered goods. Insofar as the defendant was concerned, M. Aron Corporation had no right to these goods nor to the payments made by Rooster. Thus, Raphael Roy viewed this letter as a confirmation of its suspicions regarding Mr. Aron, and it chose not to respond.

**3.** He also stated that the goods were sold for approximately $8.00 per yard but did not mention the number of yards sold. The invoices themselves do not provide enough information to permit a calculation of the exact resale purchase price.

**4.** The debtor suggests that the costs of the new screen should not be viewed as damages suffered by the defendant because the debtor never agreed "to pay for the screens." N.T. at 128. However, the correct measure of damages is determined, in part, by the reasonable additional expenses incurred by the seller in selling the goods to a new buyer after a material breach by the original buyer. *See* Uniform Commercial Code, 13 Pa.C.S.A. §§ 2703(4), 2706(a), 2710; *A1 Ferro Commodities Corp., S.A. v. Tube City Iron and Metal,* 728 F.Supp. 1158 (E.D.Pa.1990). Thus, the cost of preparing a new screen would be a portion of the defendant's damages if such preparation was necessary for Raphael Roy to resell the goods. Here, the testimony implied that new screens were necessary.

the Rooster account are concerned, Giussani testified that Raphael Roy deposited the prepayment from Rooster in its general bank account and commingled these funds with other funds on deposit; moreover, he stated that the deposit payment is still listed in its records. N.T. 117, 132–33.

The debtor filed a bankruptcy statement of financial affairs on March 22, 1989. Ex. PX–8. Schedule A–3 lists Raphael Roy as holding an unsecured claim in the amount of $283,054.00. Raphael Roy was appointed by the United States Trustee to the Official Committee of Unsecured Creditors on March 20, 1989, due to its large unsecured claim. Exhibit PX–12. Schedule B–2(b) of the bankruptcy statement lists the sum of $65,289.00 as property of the debtor on deposit with Raphael Roy for the purchase of materials.[5]

The debtor filed a proposed plan of reorganization on May 24, 1989, Ex. PX–9, and shortly thereafter, a disclosure statement. Ex. PX–10. The proposed plan, *inter alia*, called for the debtor to liquidate its assets and to pay all unsecured creditors 20% of their allowed unsecured claims. Shareholders of the debtor were to retain their shareholder interests. In the section of the disclosure statement entitled "Means for Execution of the Plan", the debtor again mentions among its various assets, "security deposits paid for certain additional piece goods." Ex. PX–10, at 13. The debtor's plan of reorganization was confirmed on November 1, 1989 with creditor assent. This adversary proceeding was then commenced on March 28, 1990.

## II.

The parties raise a plethora of issues which make resolution of this dispute more complicated than it need be. In particular, they both address the issue of the proper manner to interpret harmoniously the provisions of 11 U.S.C. §§ 524(a)(2) and 553. Raphael Roy argues that it setoff the pre-

petition deposit in question against the debtor's prepetition obligation only after the debtor's plan was confirmed. Since 11 U.S.C. § 1141(d)(1)(A) provides that the entry of the order of confirmation acts to discharge preconfirmation debts, *see generally In re Chipwich, Inc.*, 64 B.R. 670, 677 (Bankr.S.D.N.Y.1986), and since 11 U.S.C. § 362(c)(2)(C) states that the automatic stay ends upon the granting of a discharge, the defendant is therefore asserting that the setoff occurred postdischarge without violating any provision of the bankruptcy stay.

The debtor asserts that a creditor may not setoff a claim after discharge, because to do so would violate the statutory injunctive provisions of 11 U.S.C. § 524(a)(2), and cites to a number of decisions so stating. *Accord In re Dezarn*, 96 B.R. 93 (Bankr.E.D.Ky.1988); *In re Newport Offshore Ltd.*, 78 B.R. 383 (Bankr.D.R.I.1987), *on remand*, 86 B.R. 325 (Bankr.D.R.I.1988); *In re Johnson*, 13 B.R. 185 (Bankr.M.D.Tenn. 1981). *See In re Marriage of Williams*, 157 Cal.App.3d 1215, 203 Cal.Rptr. 909 (Fifth Dist, Cal.1984). *See also In re Hamilton Allied Corp.*, 87 B.R. 43 (Bankr.S.D. Ohio 1988) (setoff after discharge may violate the discharge injunction and so be civil contempt). Conversely, the defendant cites to other decisions expressly holding that a setoff after discharge under section 553 is permissible due to the express language of section 553. *Accord In re Morgan*, 77 B.R. 81 (Bankr.S.D.Miss.1987); *In re Conti*, 50 B.R. 142 (Bankr.E.D.Va.1985); *Matter of Ford*, 35 B.R. 277 (Bankr.N.D.Ga.1983); *In re Slaw*, 17 B.R. 744 (Bankr.E.D.Pa.1982). *See also Matter of Reading Co.*, 72 B.R. 293 (E.D.Pa.1987) (dictum).

Before this particular issue is discussed, it would be helpful if certain aspects of this dispute could be segregated initially. Once that division is accomplished, and the legal principles established, it will be easier to

---

**5.** Apparently, the debtor made additional prepayments for other goods which were later received. Therefore, the only invoices with prepayments in issue are those in the instant controversy.

In addition, the first installment payment which Rooster made on October 15, 1988 is not part of this dispute as it represents a transfer made more than 90 days prior to the filing of the bankruptcy petition. *See* 11 U.S.C. § 547(b)(4)(A).

decide whether the debtor is entitled to a return of all, part, or none of its $22,137.00 prepayment.

## A.

I begin by simplifying the facts. Assume that Rooster and Raphael Roy had no outstanding obligations between them as of the 90th–day prior to bankruptcy. (Either they had never dealt with each other, or all contractual obligations had been fulfilled.) Assume further that during the 90–day prepetition period prior to Rooster's bankruptcy filing, Rooster contracts with Raphael Roy to purchase fabric in the exact manner that occurred in this proceeding. That is, Rooster places four orders during the 90–day period and agrees to pay 10% at the time of ordering, 40% at the time production starts, and then 50% when the goods are ready for shipment. Assume further that Rooster pays the two initial installments but not the last; the goods are ready for shipment on the date agreed to, but Raphael Roy refuses to ship because Rooster has not tendered the balance owing.

■■■ In a nonbankruptcy context, a buyer's failure to tender the balance of the purchase price at the time agreed upon would constitute a material breach of contract for which damages would lie. *See Ellis v. Greenbaum Sons Inv. Co.*, 307 Pa. 77, 160 A. 702 (1932); *Koppers Co., Inc. v. Brunswick Corp.*, 224 Pa.Super. 250, 303 A.2d 32 (1973). *See also* 13 Pa.C.S.A. §§ 2703, 2706.[6] Those damages would be measured by the lost profits, reasonable costs incurred in connection with the contract, and incidental damages, less sums received on account. *Reaction Molding Tech. v. Gen. Elec. Co.*, 588 F.Supp. 1280,

1293 (E.D.Pa.1984) ("Under §§ 2–708 and 2–710 of the UCC, plaintiff is entitled to recover its lost profit and the reasonable expenses and incidental damages incurred as a result of the breach minus any deposit it had already collected from [the buyer]"). *Accord A1 Ferro Commodities Corp., S.A. v. Tube City Iron and Metal. See Minkin v. Fisher*, 72 Pa.Super. 32, 35 (1919); 13 Pa.C.S.A. §§ 2703, 2706, 2708, 2710. If the goods could reasonably be resold, the concept of mitigation of damages may require the seller to do so and thereby reduce its damage claim further. *See Ecksel v. Orleans Const. Co.*, 360 Pa.Super. 119, 519 A.2d 1021 (1987). If, upon resale to a third party, the total resale price plus payments by the buyer on account exceeded the original purchase price plus incidental damages, then the excess should be refunded to the defaulting purchaser, *see Lancelloti v. Thomas*, 341 Pa.Super. 1, 491 A.2d 117 (1985), unless the contract between the parties so determined the deposit as liquidated damages and such provision was reasonable. *See In re Oscar Nebel Co.*, 117 F.2d 326 (3d Cir.1941). *See also* 13 Pa.C.S.A. § 2718.[7]

■■ Here, of course, Rooster placed 50% on deposit. When Rooster failed to tender the balance due, it was in default and Rafael Roy was free to resell to a third party on reasonable terms. *See* 13 Pa.C.S.A. § 2706; *A1 Ferro Commodities Corp., S.A. v. Tube City Iron and Metal; Koppers Company, Inc. v. Brunswick Corp.* The seller did so to Watson Bros. in July 1989. Unfortunately, the seller offered no precise evidence of the resale price other than to state it was more than the balance owed and less than the original purchase price. It would therefore seem, under ba-

---

**6.** The documents offered in evidence do not reflect that the parties contractually agreed whether the laws of Pennsylvania or Italy would govern any disputes. At no time in this proceeding has the defendant made any reference to Italian law. *See* F.R.Civ.P. 44.1. Given this silence, along with the provision of 13 Pa.C.S.A. § 1105(a), I have looked to Pennsylvania law as the source of basic contract law principles applicable to the dispute. *See Cayuga Const. Corp. v. Vanco Engineering Co.*, 423 F.Supp. 1182 (W.D. Pa.1976) (applying law of the state in which

offeree/buyer was located rather than foreign country of offeror/seller).

**7.** In other words, a defaulting buyer would not be entitled to recover its deposit if such deposit was contractually viewed as a liquidated damage provision and the provision was reasonable. *See Finkle v. Gulf & Western Mfg. Co.*, 744 F.2d 1015, 1021 (3d Cir.1984); *Oscar Nebel Co.* There was no liquidated damage clause in the contract in the instant proceeding.

sic contract principles as embodied in the Uniform Commercial Code, that Rooster would be entitled to the return of only a portion of its deposit. The amount would be based upon the resale price and the incidental damages incurred by Raphael Roy.

## B.

Before turning to the amount of such recovery, and to a discussion of the relevant burdens of persuasion, it is important to address whether Rooster's bankruptcy filing alters this general result. That is, if one assumes that the defaulting buyer pays the deposit to the seller within 90 days of its bankruptcy filing, must the seller return all of the deposit, or can it offset a portion of the deposit by the amount of its damages?

■ In my view, the answer to this question is not dependent upon whether the buyer's chapter 11 plan has been confirmed, nor upon whether the damages owed by the buyer to the seller for breach of contract have been discharged. Moreover, the answer is not found in the preference provisions of 11 U.S.C. § 547(b) [8], nor in the setoff provisions of 11 U.S.C. § 553. Rather, the right of the seller of offset damages against the deposit stems from the principle of "recoupment" engrafted into the current bankruptcy code by decisional law. *Accord Lee v. Schweiker*, 739 F.2d 870, 875 (3d Cir.1984).

This definition of recoupment was offered many years ago:

Recoupment goes to the foundation of the plaintiff's claim; it is available as a defense although as an affirmative cause of action it may be barred by limitation. The defense of recoupment, which arises out of the same transaction as plaintiff's claim survives as long as the cause of action upon the claim exists. It is a doctrine of an intrinsically defensive nature founded upon an equitable reason, inhering in the same transaction, why the

plaintiff's claim in equity and good conscience should be reduced.

*Pennsylvania R. Co. v. Miller*, 124 F.2d 160, 162 (5th Cir.1941), *cert. denied*, 316 U.S. 676, 62 S.Ct. 1047, 86 L.Ed. 1750 (1942) (footnotes omitted).

■ As the Third Circuit Court of Appeals has instructed, there is a distinction between setoff and recoupment for bankruptcy purposes, and only the former is governed by the principles of section 553:

The doctrines of "setoff" and "recoupment" had their origins in the era of common law pleading, under which the scope of a "case" was far less inclusive than it is today, and under which claim joinder was far narrower. Both doctrines permitted countervailing claims, which otherwise could not have been asserted together, to be raised in a case based on any one of them. Both doctrines were subsequently adopted in bankruptcy, setoff by statute, *see* 11 U.S.C. § 108 (1976), repealed by Bankruptcy Reform Act of 1978, Pub.L. No. 95–895, 92 Stat. 2549 (1978); and recoupment by decision, *see In re Monongahela Rye Liquors*, 141 F.2d 864 (3d Cir.1944). In bankruptcy, however, setoff and recoupment play a role very different from their original role as rules of pleading. Setoff, in effect, elevates an unsecured claim to secured status, to the extent that the debtor has a mutual, pre-petition claim against the creditor. *See* 11 U.S.C. § 506(a). Setoff is limited, however, by the provisions of 11 U.S.C. § 553. Among those limitations is that pre-petition claims against the debtor cannot be setoff against post-petition debts to the debtor. Recoupment, on the other hand, allows the creditor to assert that certain mutual claims extinguish one another in bankruptcy, in spite of the fact that they could not be "setoff" under 11 U.S.C. § 553. The justification for the recoupment doctrine is that where the creditor's claim against the debtor arises from the same transaction as the debtor's claim, it is essentially a defense to the debtor's

---

**8.** The prepayments would not be transferred on account of an antecedent debt, 11 U.S.C. § 547(b)(2), since there was no debt owed to the

seller at the time of the transfer. *See also In re Aldridge*, 94 B.R. 589, 592 (Bankr.W.D.Mo. 1988).

claim against the creditor rather than a mutual obligation, and application of the limitations on setoff in bankruptcy would be inequitable. In bankruptcy, the recoupment doctrine has been applied primarily where the creditor's claim against the debtor and the debtor's claim against the creditor arise out of the same contract.

*Lee v. Schweiker,* 739 F.2d at 875 (citations omitted) (footnotes omitted). *Accord In re B & L Oil Co.,* 782 F.2d 155 (10th Cir.1986); *University Medical Center v. Sullivan,* 122 B.R. 919 (E.D.Pa.1990).

■ Obviously, the claim of the buyer to recover its deposit because it has not received the goods it sought to purchase and the claim of the seller for damages due to the buyer's breach of contract stem from the same contract. This is a paradigmatic example of recoupment. *Accord Lee v. Schweiker,* 739 F.2d at 875; *In re Sherman,* 627 F.2d 594 (2d Cir.1980); *In re Midwest Service and Supply Co.,* 44 B.R. 262 (D.Utah 1983); *Waldschmidt v. CBS, Inc.,* 14 B.R. 309 (M.D.Tenn.1981); *In re Clowards, Inc.,* 42 B.R. 627 (Bankr.D.Idaho 1984). Therefore, the buyer's bankruptcy filing does not alter the result which would occur outside of bankruptcy. That is, after the buyer's bankruptcy, the seller is entitled, by way of recoupment, to offset from the deposit held its damages caused by the buyer's breach. *See id.* Moreover, this result is not affected by whether the breach occurred before or after the bankruptcy was filed, *Lee v. Schweiker; In re B & L Oil Co.; University Medical Center v. Sullivan,* or whether the contract is viewed as executory or not. *See In re Aspen Data Graphics, Inc.,* 109 B.R. 677 (Bankr. E.D.Pa.1990); *In re Zienel Furniture, Inc.,* 13 B.R. 264 (Bankr.E.D.Wisc.1981); *In re Standard Furniture Co.,* 3 B.R. 527 (Bankr.S.D.Cal.1980).[9]

## C.

The question whether a creditor may setoff, (rather than recoup), a debt under 11 U.S.C. § 553 after the creditor's claim has been discharged in bankruptcy is generally viewed as a clash of competing statutory provisions. *See, e.g., In re Slaw.* Section 553 states that the right of setoff is limited only by certain other code provisions and omits any reference to section 524. Section 524(a)(2), on the other hand, enjoins a creditor from "... an act, to collect, recover or *offset* any [discharged] debt...." (Emphasis added).

■ This question is further complicated by various bankruptcy principles and recognized methods of statutory construction. For example, a right of setoff is included under 11 U.S.C. § 506(a) as an allowed secured claim. As a general rule, liens— which are secured interests—are not discharged in bankruptcy. *See Long v. Bullard,* 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886); *Estate of Lellock v. Prudential Ins. Co. of America,* 811 F.2d 186, 189 (3d Cir.1987). If a right of setoff is analogous to a lien, it too may not be discharged. Conversely, former section 14(f)(2) of the repealed Bankruptcy Act of 1898, (former 11 U.S.C. § 32(f)(2)), which had been held not to bar a creditor's attempt to setoff a discharged debt, *see, e.g., Record Club of America v. United Artists Records,* 80 B.R. 271, 278 (S.D.N.Y.1987); *Binnick v. Avco Financial Servs. of Nebraska, Inc.,* 435 F.Supp. 359, 363 (D.Neb.1977), did not contain the express reference now found in section 524(a)(2) of the Code prohibiting offsets. This statutory addition may reflect a congressional intent to expand the reach of the discharge injunction to setoffs. *See also Pennsylvania Dept. of Public Welfare v. Davenport,* — U.S. —, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). *See generally Midlantic National Bank v. New Jersey Dept. of Environmental Pro-*

---

**9.** Since a creditor may recoup damages caused by the postpetition rejection of an executory contract—which under 11 U.S.C. § 365(g) is treated as though it were a prepetition breach—I need not decide whether a contract to purchase goods is an executory contract within the meaning of section 365. *See generally Shar-*

*on Steel v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 39 (3d Cir.1989); *In re Monge Oil Corp.,* 83 B.R. 305 (Bankr.E.D.Pa.1988). Moreover, I need not decide whether Rooster's breach occurred on February 10, 1989—just prior to the bankruptcy filing—or at some later point postpetition.

*tection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (current Bankruptcy Code will be interpreted consistently with the former Bankruptcy Act unless Congress demonstrates an intent to change a particular result). In addition, courts have repeatedly held that a creditor's right of setoff is not mandatory but is permissive. " 'Its application, when properly invoked before a court, rests in the discretion of that court, which exercises such discretion under the general principles of equity.' " *In re Norton,* 717 F.2d 767, 772 (3d Cir. 1983) (*quoting* 4 *Collier on Bankruptcy,* ¶ 553.02 (15th ed. 1983)). *Accord Matter of Bevill, Bresler & Schulman Asset Mgmt.,* 896 F.2d 54, 57 (3d Cir.1990). The permissive nature of setoff may distinguish it from a nondischargeable lien. *See also In re Pieri,* 86 B.R. 208, 212 (9th Cir. BAP 1988) ("We do not find that the secured status that Congress accorded setoff rights for the purpose of bankruptcy administration would elevate those rights to permanent lien status against the property"). This nature, when coupled with an express congressional expansion of the scope of the discharge injunction, may support a statutory analysis favoring the prohibition of setoff rights after discharge.

Because recoupment can be raised after bankruptcy in connection with a prepetition contract, and because recoupment permits no affirmative recovery, the distinction between recoupment and setoff may provide the answer to those courts who have struggled to harmonize a creditor's setoff rights with the injunctive provisions of section 524(a)(2). *Cf. In re Davidovich,* 901 F.2d 1533 (10th Cir.1990) (although the court in one part of its opinion seems to suggest that a "setoff" may be asserted after discharge of a creditor's debt, it does note the distinction between recoupment and setoff and permits only the creditor's assertion of recoupment).[10]

■ In the instant case I need not reach this precise issue because I am unpersuaded that Raphael Roy acted to setoff the debtor's deposit against its prepetition debt only after confirmation and after the discharge of Raphael Roy's prepetition claim. Whether the creditor undertook the bookkeeping entry or not, in July 1989 when it resold the Rooster goods to a third party, it mitigated its damages and effectively recouped its losses arising from Rooster's failure to pay for the goods ordered against Rooster's tendered deposit, plus setoff any remainder of the deposit against Raphael Roy's prebankruptcy claim. *Accord United States v. Norton,* 717 F.2d at 772 ("[S]etoff is accomplished when a creditor gives 'sufficient evidence of intent' to make a setoff.... [T]he retention of a debtor's funds by a creditor provides sufficient evidence of an intent to setoff") (quoting *Goldstein v. Jefferson Title and Trust Co.,* 95 Pa.Super. 167, 170 (1928)); *In re Aquasport, Inc.,* 115 B.R. 720, 722 (Bankr. S.D.Fla.1990).

■ Under Pennsylvania law setoff occurs automatically and does not require a creditor to make book entries charging one account and crediting the other before asserting its right to priority. *Aarons v. Public Service Building & Loan Association,* 318 Pa. 113, 178 A. 141 (1935). *Accord Pittsburgh Nat. Bank v. U.S.,* 657 F.2d 36 (3rd Cir.1981). Additionally, in *United States v. Norton,* the court reasoned that if "a creditor could circumvent the automatic stay simply by delaying the entry of a setoff or credit on its books, it could hold the funds until the case was closed and then deposit them into its own bank account." *Id.* at 773.

When Raphael Roy sold the goods to Watson Bros. was the point at which Rooster could not possibly have received the fabric. The defendant's act of retaining Rooster's funds on deposit indicated Ra-

---

10. Indeed, the principal decision relied upon by Raphael Roy, *In re Slaw,* may fairly be viewed as involving an offset in the nature of recoupment rather than setoff. *See also In re Ford,* 35 B.R. at 280 ("The debtor's ability to invoke the injunctive power of § 524(a)(2) to preclude the creditor's use of § 553 may be limited in circumstances where the debtor institutes suit against the creditor on a cause of action *which arose from the same transaction as the creditor's claim against the debtor*") (emphasis added).

phael Roy's intent to offset against antecedent debt regardless of any bookkeeping. *Norton; Pittsburgh Nat. Bank.* Moreover, Mr. Giussani admitted in testimony that it was Raphael Roy's intent, by no later than the date of the Watson Bros. sale, to keep the prepayment. N.T. 119. Thus, I conclude that, once Raphael Roy resold the goods and did not refund that portion of the debtor's deposit in excess of the its damages under the sales contract, it was effectively setting off the balance of the deposit against the debtor's large prepetition debt.

### D.

While the automatic stay, 11 U.S.C. § 362(a)(7), forbids a creditor from using its setoff rights under section 553, *see, United States v. Norton,* it does not prevent it from using its right of recoupment. *Accord University Medical Center v. Sullivan,* 122 B.R. at 925–26; *In re Hiler,* 99 B.R. 238 (Bankr.D.N.J.1989). *See Lee v. Schweiker* (the discussion of the recoupment/setoff distinction was made in the context of the applicability of the automatic stay). *Contra In re Memorial Hospital of Iowa County, Inc.,* 82 B.R. 478 (W.D.Wisc.), *appeal dismissed,* 862 F.2d 1299 (7th Cir.1988).[11] Therefore, if one ignores Rooster's prepetition debt to Raphael Roy, the debtor is entitled to recover only the amount of its deposit less the damages caused by its breach in failing to fulfill the terms of its contract to buy goods. *See generally Reaction Molding Tech. v. Gen. Elec. Co.,* 588 F.Supp. at 1293.

### E.

I further conclude that the existence of the large prepetition debt owed by the debtor to Raphael Roy does not alter this result. It is certainly counterintuitive to conclude that the debtor is entitled to a greater recovery of its prepayment because it also had precontractual dealings with the

seller which resulted in a substantial unpaid debt. That is, there is no reason that the injured seller should lose its right of recoupment simply because it also has a claim for earlier breaches of different contracts.

Conversely, under nonbankruptcy law, the existence of this prior debt would allow Raphael Roy to setoff the amount of the excess deposit to be refunded to the buyer against the prior outstanding debt. *See Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030 (5th Cir.1987). *See also First Wisconsin Financial Corp. v. Yamaguchi,* 812 F.2d 370, 374 (7th Cir. 1987) (if debtor does not specify allocation of payment to a particular debt, creditor may allocate payment as it so chooses); *In re Comer,* 18 B.R. 969 (Bankr.M.D.Pa. 1982) (court reaches same conclusion under Pennsylvania law). In fact, the parties' compromise agreement implicitly so provided.

Once Raphael Roy's right of recoupment is recognized, the issue becomes whether the defendant may setoff the excess deposit—that is, the amount of the deposit greater than the recoupement damages—received against its large outstanding prepetition claim—a claim based upon the debtor's violation of earlier purchase contracts. That issue will be addressed below.

### III.

The issue whether the defendant may also setoff rather than only recoup its prepetition claims against the debtor's prepetition deposit is made complicated by two factors: first, the setoff occurred in violation of the automatic stay under section 362(a)(7); second, the setoff clearly would represent an improvement in Raphael Roy's position, yet the setoff occurred postpetition.[12]

---

**11.** Even if the automatic stay were applicable, a court may annul the stay and grant *nunc pro tunc* relief. *E.g. In re Albany Partners, Ltd.,* 749 F.2d 670 (11th Cir.1984). Recoupment may well warrant annulment of the stay—if it is applicable.

**12.** As the debtor does not raise the issue, I shall assume without deciding that the defendant's asserted right of setoff would not run afoul of 11 U.S.C. § 553(a)(3).

By virtue of sections 547(c)(5)[13] and 553(b), an unsecured creditor may not improve its position due to prepetition transfers made within 90 days of the debtors bankruptcy filing unless all unsecured claims would be paid in full. Such an improvement runs counter to the congressional policy of equality of treatment for creditors of the same priority of payment.[14] Here, of course, the debtor tendered payments to Raphael Roy prepetition which are the subject of this dispute. Technically though, the defendant's setoff action occurred postpetition. The question thus becomes whether Raphael Roy's conduct is permissible because it waited until after Rooster's bankruptcy to act.

Under section 553(b), had the seller attempted prepetition to immediately setoff the deposits against the outstanding antecedent obligations, it would have improperly improved its position within the 90–day prebankruptcy period and so be liable for a return of these prepayments. *See Lee v. Schweiker; In re Rosenthal*, 106 B.R. 73 (Bankr.W.D.Pa.1989); *In re Riggsby*, 34 B.R. 440 (Bankr.E.D.Tenn.1983). At the outset of the 90–day period, Raphael Roy had an unsecured claim of almost $300,000.00 and had no obligation in favor of the debtor. Thus, its insufficiency at that point equalled the entire amount of its claim. It received the prepayments at issue within the 90–day period prior to bankruptcy. As a result, any setoff permitted as to those deposits would represent an improvement of position.

Courts are divided though whether a creditor may be permitted a postpetition setoff when the result would be the same as if a prepetition setoff had occurred—i.e., an improvement of position.

Certainly, it is not intuitive that a creditor's setoff rights should be enhanced by a debtor's voluntary bankruptcy filing. In general, rights of creditors are no greater against the estate, (as opposed to rights against other creditors), than they were against the debtor absent its bankruptcy. Specifically as to setoff, it is axiomatic that section 553 does not create any new rights "but merely preserves the common-law right under applicable nonbankruptcy law." *In re Pieri*, 86 B.R. at 210. *Accord Durham v. SMI Industries Corp.*, 882 F.2d 881, 883 (4th Cir.1989). But absent section 553, Raphael Roy would have a common-law right to setoff the entire prepayment deposit received from Rooster. Thus, the issue is not whether a creditor obtains enhanced rights by a debtor's bankruptcy, but whether the restriction on the common-law right of setoff is as great when the setoff occurs postpetition as it is when it occurs prepetition. *But cf. Durham v. SMI Industries Corp.*, 882 F.2d at 884 ("It would be inequitable to construe section 553(b) to prevent 'the parties from voluntarily doing, before the petition is filed, what the law itself requires to be done after proceedings in bankruptcy are instituted' ") (*quoting Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528–29, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913)).

The language of section 553(b)(1) refers to prepetition setoffs, not postpetition setoffs. *See, e.g., In re Bass Mechanical Contractors, Inc.*, 88 B.R. 201, 203 (Bankr. W.D.Ark.1988). *See also In re Aspen Data Graphics, Inc.*, 109 B.R. 677, 684 (Bankr.E.D.Pa.1990). Based upon this language and upon the policy argument that creditors should be prevented from exercising their common law setoff rights only if such exercise might be a contributing factor in the financial demise and resulting bankruptcy of a debtor, some courts and commentators have concluded that the improvement of position test is irrelevant to the postpetition allowance of setoff under sections 362(d) and 553. *E.g. In re Energy Co-op., Inc.*, 100 B.R. 992, 995 (N.D.Ill.

---

**13.** There is a conceptual overlap between the provisions of sections 547—involving preferences—and 553 involving setoffs. However, the Third Circuit Court of Appeals has instructed "that, where a setoff right is being asserted, section 553, rather than section 547, governs the creditor's rights." *Lee v. Schweiker*, 739 F.2d at 873 n. 4.

**14.** *See generally* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 183–86 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787; 4 *Collier on Bankruptcy*, ¶ 553.09 (15th ed. 1991).

1989); *In re Bass Mechanical Contractors, Inc.; 4 Collier on Bankruptcy,* ¶ 553.15[2] at 553–65 (15th ed. 1991); 2 *Norton Bankruptcy Law and Practice,* § 33.03 (1981).

Other decisions consider the improvement of position test as one factor to be considered when a court exercises its discretion, *see generally Matter of Holtkamp,* 669 F.2d 505 (7th Cir.1982), in determining whether to lift the bankruptcy stay under section 362(d) and permit the creditor to setoff postpetition. *Accord Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030, 1041 n. 13 (5th Cir.1987) ("Exxon could attempt to obtain post-petition setoff, and petition the bankruptcy court for this right and that court could then take into account the improvement of position test"); *In re Aquasport,* 115 B.R. at 722–23. *See In re Virginia Block Co.,* 16 B.R. 560, 561 (Bankr.W.D.Va.1981) ("The creditor can be relieved from the stay, and proceed with the setoff, only after showing that the proposed setoff will not afford the creditor preferential treatment ... Preferential treatment under § 553 is determined by using an 'improvement in position' test ...").

Although *In re Compton Corp.,* 22 B.R. 276 (Bankr.N.D.Tex.1982) has been cited as holding that the improvement of position test is not applicable to a court's determination as to propriety of relief from the stay to permit a postpetition setoff, that court also stated:

> It is not necessary to mechanically apply the § 553(b) test, insofar as this Court is capable of taking the improvement factor into consideration when making a judgment as to the amount that [the creditor] may be allowed to setoff its claim.

22 B.R. at 278.

On balance, I agree that improvement of position, while not determinative, may be considered in deciding whether postpetition setoff should be allowed. Since setoff is permissive and not mandatory, since it is based upon equitable principles, and since any policy implicit in the Bankruptcy Code of encouraging creditors not to precipitate a debtor's decline by exercising setoff

rights prepetition may be supported by recognizing the improvement of position issue as but one factor in the relief from stay matrix, a broad consideration of factors including those defined by section 553(b)(1) is warranted. *Braniff Airways, Inc. v. Exxon Co., U.S.A.; In re Compton Corp.* Indeed, the recognition that postpetition setoff is different from prepetition setoff in that the former alone is properly completed after court review suggests that such review can consider more than just the issues posed by section 553(a)—e.g., mutuality of the debts. *See, e.g., In re Penn Central Transp. Co.,* 315 F.Supp. 1281 (E.D.Pa.1970), *aff'd,* 453 F.2d 520 (3d Cir.), *cert. denied,* 408 U.S. 923, 92 S.Ct. 2493, 33 L.Ed.2d 334 (1972) (bank setoff not permitted because it would frustrate railroad reorganization process); *In re Windsor Communications Group, Inc.,* 79 B.R. 210, 216 (E.D.Pa.1987) (setoff denied when creditor has converted debtor's property); *In re Cabrillo,* 101 B.R. 443 (Bankr.E.D. Pa.1989) (setoff request denied when creditor asserts a security interest in property it seeks to offset and creditor fails to meet its burden under section 362(d)).

Here, as noted above, Raphael Roy's position would be improved if it were permitted to retain the prepetition deposit received beyond recoupment damages. Moreover, the defendant has effectively setoff that deposit by its postpetition conduct in retaining the funds after resale of the goods, without seeking court approval. A creditor's violation of the bankruptcy stay in setting off a prepetition debt without court approval has been considered by some courts as a significant factor in determining whether a creditor may retain prepetition funds. *Accord, e.g., In re Charter Co.,* 103 B.R. 302, 305 (M.D.Fla.1989).

 Given the defendant's unilateral conduct in violation of section 362(a)(7), its improvement of position, plus its ability to recoup damages for the debtor's breach of contract, I conclude that the defendant is not entitled to a postpetition setoff on the facts as presented. *See Braniff Airways, Inc. v. Exxon Co., U.S.A.; In re Charter Co.* As a result, while Raphael Roy could

retain the excess deposit beyond recoupment under basic contract law, basic bankruptcy law, (which is supreme over state law, *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971)), requires that excess to be distributed to all unsecured creditors.[15] *See id.* Therefore, the debtor is entitled to a return of this difference.

#### IV.

██ One exception to this conclusion is judicial estoppel, and that issue is raised by the defendant in this proceeding. If the debtor had failed to disclose the prepetition deposit made to Raphael Roy as an asset of its estate potentially available for distribution to creditors, then the debtor would be estopped from attempting to recover the asset itself after confirmation. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir.1988). In such an instance, creditors would have improperly voted to accept a distribution from the debtor's estate without knowing all its material assets; one of the debtor's assets—the prepayment—would have been hidden by the debtor in an attempt to retain it after the bankruptcy was administered. *Id. See also Payne v. Wood*, 775 F.2d 202 (7th Cir.1985) (debtor may not be permitted to amend exemption list to include the proceeds of property wrongfully omitted from his bankruptcy schedules after the trustee learns about this property).

██ I conclude here, though, that there was sufficient disclosure of Rooster's assets as to render judicial estoppel unwarranted. *Alloy Metal Wire Works v. Congress Financial Corp.*, 95 B.R. 340 (E.D.

Pa.1989). While it is quite true, as the defendant argues, that neither the approved disclosure statement sent to creditors nor the confirmed plan itself expressly provided for the instant litigation after confirmation, all creditors including the defendant were informed of the asset both in the disclosure statement and in the debtor's initial schedule of assets. In addition, the unsecured creditors voted in favor of a fixed return based upon the debtor's liquidation of its assets. Implicit in that information is not simply the existence of the instant claim but of the fact that the debtor intended to retain the proceeds of all assets liquidated beyond that sum needed to pay creditors.

██ Judicial estoppel is a doctrine which should be invoked cautiously. *Accord Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1167 (4th Cir.1982). Here, the debtor provided enough information prior to confirmation that it would be inappropriate to now estop it from recovering sums to which it is entitled from the defendant. *Alloy Metal Wire Works v. Congress Financial Corp.*

#### V.

██ Finally, I return to the question of recoupment damages. The injured seller has the duty of establishing the damages resulting from the buyer's breach of contract. *See Foam & P. Div., Tenneco Chem. v. General Drivers, Etc.*, 520 F.2d 945, 948 (3d Cir.1975). Not only is recoupment an affirmative defense, but the seller is in much the better position to have information relating to its damages. *See gener-*

---

**15.** That in fact unsecured creditors will not receive this excess by virtue of the terms of the confirmed plan is not relevant. A number of courts have concluded that a debtor may recover a preference even after confirmation and even if the recovery will be retained by the debtor under the terms of the plan. *E.g. In re Enserv Co., Inc.*, 64 B.R. 519 (9th Cir. BAP 1986), *aff'd*, 813 F.2d 1230 (9th Cir.1987). This result follows: from the lack of any statutory provision limiting preferential recoveries to creditors; from the practical consideration that a court may not know at the time a proceeding is decided to whom its proceeds will flow; from the congressional desire to prevent a particular

creditor from receiving more than that to which it is entitled; and, from a recognition that a willingness of a debtor-in-possession to fund a plan of reorganization with a guaranteed return to creditors may stem in part from the plan proponent's right under the plan to receive the proceeds from future successful litigation. *See In re Tennessee Wheel & Rubber Co.*, 64 B.R. 721 (Bankr.M.D.Tenn.1986), *aff'd*, 75 B.R. 1 (M.D. Tenn.1987); *In re Centennial Industries, Inc.*, 12 B.R. 99 (Bankr.S.D.N.Y.1981).

Setoff recoveries should also be permitted even if the recovery will not be distributed to unsecured creditors for these same reasons.

*ally* McCormick *on Evidence,* §§ 336–37 (2d ed. 1972); IX *Wigmore on Evidence,* §§ 2485–87 (rev. ed. 1981).

On the record presented, Raphael Roy received more than the purchase price from the combined payments of Watson Bros. and Rooster. How much more is unquantified since the amount paid by Watson Bros. was unstated. But clearly Rooster is entitled to the return of this excess less incidental costs related to the Watson sale. As to those incidental costs, Raphael Roy offered evidence of two types: first, the cost of additional storage; second, the creation of new screens. *See A1 Ferro Commodities Corp., S.A. v. Tube City Iron and Metal,* 728 F.Supp. at 1166. Testimony as to both placed the costs at figures greater than $1,000.00 and $10,000.00 respectively, without disclosing how much greater. Given Raphael Roy's burden on this issue, I conclude that only $11,000.00 in damages have been fairly proven. And since I do not know how large the excess of the total payments was above the original purchase price, an issue upon which the defendant also has the burden, then the only basis I have to measure recoupment damages is to subtract the proven incidental damages from the prepayment.[16]

As a result, the debtor is entitled to the recovery of $22,137.00 less $11,-000.00—or $11,137.00. To this sum the debtor requests interest at 12% an annum from March 1989, arguing that it charges its delinquent payors 1% per month. While the debtor is correct that prejudgment interest can be assessed for the recovery of a creditor's improper setoff under 11 U.S.C. §§ 550, 553, *see Smith v. Mark Twain Nat. Bank,* 805 F.2d 278, 291 (8th Cir.1986); *In re L & T Steel Fabricators, Inc.,* 102 B.R. 511, 521 (Bankr.M.D.La.1989), there is no basis to impose the requested interest rate as Raphael Roy never agreed to pay such interest to the debtor. Rather, interest for an improper setoff runs at the legal rate found in 28 U.S.C. § 1961, *see In re Nucorp Energy, Inc.,* 902 F.2d 729, 734 (9th Cir.1990); *In re Home Co.,* 108 B.R. 357 (Bankr.N.D.Ga.1989); *In re L & T Steel Fabricators, Inc.,* 102 B.R. at 520–24; *In re Harvard Mfg. Corp.,* 97 B.R. 879, 884 (Bankr.N.D.Ohio 1989), from the date of the debtor's demand for the return of the excess deposit. *Accord Smith v. Mark Twain Nat. Bank,* 805 F.2d at 291–92. While Mr. Aron demanded the return of the deposit in June and July 1989, I agree with the defendant that the debtor was not making this demand. Thus, the demand of the debtor first occurred with the filing of the instant adversary proceeding on March 28, 1990. *See id.; In re L & T Steel Fabricators, Inc.* Postjudgment interest also runs at the legal rate as well.

An appropriate order shall be entered.

## ORDER

AND NOW, this 16 day of May, 1991, for the reasons stated in the accompanying memorandum opinion, it is hereby ORDERED that judgment shall be entered in favor of the plaintiff, Rooster Inc., and against defendant, Raphael Roy, S.R.L., in the amount of $11,137.00 with interest at the rate provided in 28 U.S.C. § 1961 from March 28, 1990.

---

16. Even though I do not know the precise amount of the Watson Bros. purchase price, I do know that it was less than the original price. Therefore, the incidental damages from the resale must be deducted from the deposit paid.