### In re SOUTHERN INDUSTRIAL BANKING CORPORATION d/b/a Daveco, Debtor.

### Thomas E. DUVOISIN, Trustee, Plaintiff,

### v.

### EAST TENNESSEE EQUITY, LTD., Theodore A. Erck and James E. Steiner, Defendants.

Bankruptcy No. 3–83–00372.

Adv. No. 3–85–0949.

United States Bankruptcy Court, E.D. Tennessee.

March 26, 1986.

---

Dearborn & Ewing, James R. Kelley, Cyrus L. Booker, Ann Vix, Nashville, Tenn., for plaintiff.

Tipton, Eshbaugh & Simpson, Joseph M. Tipton, Knoxville, Tenn., for defendants East Tennessee Equity, Ltd. and Theodore A. Erck.

**1.** Originally, defendants also asserted as additional grounds for dismissal the contention that this court lacks jurisdiction because the entity Southern Industrial Banking Corporation could not properly be a debtor under 11 U.S.C.A. § 109 (West 1979).

Since the filing of defendants' motion, however, the district court has had occasion to address and decide this issue. The district court held that SIBC was eligible under the Bankrupt-

CLIVE W. BARE, Bankruptcy Judge.

Plaintiff, in his capacity as the Trustee of the Liquidation Trust established pursuant to the Modified Plan of Reorganization of Southern Industrial Banking Corporation, has sued defendants to recover alleged fraudulent conveyances under 11 U.S.C.A. § 548(a) (West 1979).

Defendants East Tennessee Equity, Ltd. and Theodore A. Erck have moved to dismiss this action, asserting (1) that plaintiff "is not a proper party to prosecute an action under Title 11 U.S.C. § 548 and has no standing to maintain this action" and (2) that "[t]he asset or value sought by the filing of this adversary proceeding will not be distributed so as to result in equality of distribution among the creditors of Southern Industrial Banking Corporation." Motion to Dismiss of East Tennessee Equity, Ltd. and Theodore A. Erck (filed August 9, 1985).[1]

**I**

On March 10, 1983, Southern Industrial Banking Corporation filed a petition for reorganization under chapter 11 of the Bankruptcy Code. SIBC operated as a debtor in possession only until April 19, 1983, when this court appointed Irwin A. Deutscher as trustee.

On October 28, 1983, Irwin A. Deutscher, Trustee, filed the Modified Plan of Reorganization. On November 28, 1983, the court entered Order No. 79, confirming the Modified Plan, conditioned upon the occurrence of certain contingencies (e.g. the securing of FDIC insurance coverage). On January 20, 1984, this court entered Order No. 94, making confirmation of the Modified Plan effective January 20, 1984.

cy Code to be a chapter 11 debtor and that subsequent changes in the nature of the reorganized entity did not affect the ability of plaintiff as Liquidating Trustee to bring actions to recover on preference claims constituting assets of the Liquidation Trust. *Thomas E. DuVoisin, Liquidating Trustee v. Hugh G. and Hazel Anderson*, 59 B.R. 978 (E.D.Tenn.1986).

The Modified Plan called for SIBC to be merged into a federally insured successor-in-interest. Under the Modified Plan, upon confirmation, certain assets of SIBC were to be delivered to the Creditors' Liquidation Trust to be realized upon by plaintiff as Liquidating Trustee. Specifically, "these assets consist of approximately $26 million of commercial loans, any claim based on preferential transfers and fraudulent conveyances of property of S.I.B.C., and any claim of S.I.B.C. that arose before March 10, 1983." Trustee's Amended Disclosure Statement, Part VI (filed October 28, 1983). (Upon confirmation, under the Modified Plan the successor-in-interest retained those assets of SIBC which were not conveyed to the Creditors' Liquidation Trust under the Liquidation Trust Agreement.) *Id.*, Part V.

Plaintiff, as Liquidating Trustee, was granted the right and power to bring suit to enforce the various claims comprising the Liquidation Assets. All proceeds from recoveries of preferences and fraudulent conveyances (net of reasonable and necessary expenses) were to be paid to, and retained by, the successor in interest. Proceeds from recoveries based on Liquidation Trust assets other than preference and fraudulent transfer claims were to be applied (1) to fund the so-called Reserve Fund,[2] (2) then, to the extent available, to be paid to holders of Contingent Interest Certificates,[3] and (3) to any extent further available, to be paid half to the Contingent Interest Certificate holders (on a pro rata basis) and half to the successor-in-interest.

Trustee's Amended Disclosure Statement, Part VIII. G.

Under the Modified Plan, creditors in Class 1 (administrative expenses), Class 2 (secured claims), Class 3 (passbook claims not exceeding $999.00), and Class 4(a) (general unsecured claims, other than Class 3, of $999.00 or less) were unimpaired. The remaining general unsecured claims, impaired under the plan, were classified as follows:

Class 4(b)(i): 93% of general unsecured claims greater than $999.00 but not greater than $5001.00 (excluding Class 3 claims)

Class 4(b)(ii): 7% of general unsecured claims greater than $999.00 but not greater than $5001.00 (excluding Class 3 claims)

Class 4(c)(i): 27.30% of general unsecured claims exceeding $5001.00

Class 4(c)(ii): 72.70% of general unsecured claims exceeding $5001.00

Modified Plan of Reorganization, Article III.

Creditors with general unsecured claims of more than $999.00 and not more than $5001.00 received a distribution consisting of a federally insured certificate of deposit for the 93% portion of their claim classified as Class 4(b)(i) and "Warrants" to purchase common stock (for $1.00 per share) in the successor-in-interest for the 7% portion of their claim classified as Class 4(b)(ii). Creditors with general unsecured claims exceeding $5001.00 received a distribution consisting of a federally insured certificate of deposit for the 27.30% of their claim classified as Class 4(c)(i) and shares of pre-

---

**2.** The "Reserve Fund" consists of a separate account containing an amount (not to exceed $5 million) designated by the successor-in-interest to complement its anticipated capital requirements as determined on the basis of generally accepted prudent and reasonable banking practices. The successor-in-interest has the right to require a distribution to it from the Reserve Fund in order to maintain an acceptable assets-to-liabilities ratio. On the tenth anniversary of the consummation of the plan, the Reserve Fund is to be delivered to the successor in interest for distribution to holders of Contingent Interest Certificates. Trustee's Amended Disclosure Statement, Part VIII. G. 1.

**3.** Holders of claims in Class 4(c)(ii) received a "Contingent Interest Certificate" as part of their distribution under the plan. This certificate entitled the holder to a potential distribution from all liquidation assets comprising the Liquidation Trust in the event that funds were available after satisfying the other requirements of the plan (e.g. the Reserve Fund). There was no assurance that the liquidation assets would be sufficient to ever result in a distribution to holders of these Contingent Interest Certificates. Trustee's Amended Disclosure Statement, Part H.3.

ferred stock in the successor-in-interest, plus a Contingent Interest Certificate,[4] and Warrants to purchase common stock, for the 72.70% of their claim classified as Class 4(c)(ii). Modified Plan of Reorganization, Article IV.

Thus, under the Modified Plan, each general, unsecured creditor whose claim was impaired under the plan received, as a portion of his or her distribution, rights to stock ownership in the successor-in-interest to the debtor.

## II

Defendants' Motion to Dismiss is without merit and will accordingly be denied.

In *Centennial Industries, Inc. v. NCR Corporation (In re Centennial Industries)*, 12 B.R. 99 (Bankr.S.D.N.Y.1981) defendants in a preference action, sued under provisions of the former Bankruptcy Act, asserted a defense similar to that propounded by defendants in the instant proceeding. In *Centennial* the court had confirmed a plan of arrangement providing for payments of a specific percentage to unsecured creditors over a five-year period. After confirmation, the reorganized debtor objected to the defendant's claim and sought recovery of preferential payments under the statutory provision making claims of preference recipients non-allowable until their surrender of any preferential payment received by them.

Asserting that the purpose of the statute was to increase the amount distributed to unsecured creditors, the defendant argued—since the dollar amount to be received by unsecured creditors had been fixed by the plan and would not be increased by recovery of the preference—that a post-confirmation recovery of the preference from the defendant would not further the purpose of the statute. The court disagreed, observing:

This Court holds that as long as the unsecured creditors receive some benefit from the recovery of the preference, even if it is not an increase in the amount the creditors will receive, 57(g) will apply. In this case any recovery by Centennial will increase the likelihood of the creditors receiving their future payments. Therefore, a recovery under 57(g) is permitted. ... In Centennial's case the plan calls for payments over five years and this Court therefore has reason to protect further the rights of the creditors to insure that there are sufficient assets for the debtor to meet his obligations. While it is true that the Court had found the plan feasible when it was confirmed, a finding of feasibility is far short of a guarantee of the consummation of the plan. The recovery of this preference will be additional security for the fulfillment of the debtor's plan.

12 B.R. at 102.

■ This court finds such reasoning equally applicable to the case at bar. As noted, all those general, unsecured creditors whose claims were impaired under the Modified Plan received as part and parcel of their distribution either actual shares of stock or certain rights to purchase shares of stock in the successor-in-interest. Clearly, to the extent that plaintiff's recovery of fraudulent transfers and preferences operates to increase the assets and financial health of the successor-in-interest, it also operates to proportionally increase the value of those ownership rights in the successor-in-interest which constitute a portion of the unsecured creditors' distribution under the plan.[5] This court must reject the contention that the value sought to be recovered from defendants "will not be distributed so as to result in equality of distribution among the creditors" of SIBC.

■ This court also rejects the contention that plaintiff has no standing to pur-

---

4. See note 3, supra.

5. Furthermore, to the extent that recovery of preferences and fraudulent conveyances increases the assets of the successor-in-interest and reduces the successor-in-interest's need to

draw on the Reserve Fund, creditors holding Contingent Interest Certificates will benefit by having the likelihood or amount of a distribution to them increased.

sue a § 548 action against defendants. Section 1123(b) expressly provides:

> (b) Subject to subsection (a) of this section, a plan may—
>
> .    .    .    .    .
>
> (3) provide for—
>
> (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
>
> (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest. . . .

11 U.S.C.A. § 1123(b) (West 1979).

The Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. . . ." 11 U.S.C.A. § 101(4)(A) (West 1979). Section 550 provides that to the extent a transfer is avoided under § 547 or § 548 "the trustee may recover, *for the benefit of the estate,* the property transferred, or, if the court so orders, the value of such property." 11 U.S.C.A. § 550(a) (West 1979) (emphasis supplied). Section 541 provides that property of the estate includes "[a]ny interest in property that the trustee recovers under section . . . 550 . . . of this title." 11 U.S. C.A. § 541(a)(3) (West 1979).

Under the former Bankruptcy Act, the statutory predecessor to § 1123(b) was 11 U.S.C.A. § 616(13) (West 1970) (repealed 1978). The legislative history of that provision made clear that its aim was to make possible the formulation and consummation of a plan before completion of the investigation and prosecution of causes of action such as those for previous insider misconduct and mismanagement of the debtor. Thus, the statute was in furtherance of the purpose of preserving all assets of the estate while facilitating confirmation of a plan. *See generally* J. Moore and L. King, 6A *Collier on Bankruptcy* ¶ 10.22 (14th ed. 1977).

If a plan fixing treatment of and distribution to creditors may be so formulated and confirmed prior to the recovery of such claims, this court fails to see why the same should not be true with regard to the preservation and retention of the claims here in issue. This court notes that § 1123(b) now provides for the retention and enforcement of claims by the *debtor* as well as by a trustee or representative of the estate. (Former § 616(13) merely provided for retention and enforcement by the trustee or an examiner appointed for the purpose.) Also significantly, § 1123(b) has added the word "any," thus providing now for the retention and enforcement of "*any* such claim or interest." (emphasis supplied). Both these changes indicate, if anything, a legislative intention to liberalize, rather than to constrict, the scope of the provision.

The key point should be obvious—§ 1123(b) so applied does not here redound to the isolated or exclusive benefit of the reorganized entity but will clearly result in the receipt of augmented value by those parties intended to be the beneficiaries of distribution under the plan.

Defendants cite and rely upon *Texas Consumer Financial Corporation v. First National City Bank,* 365 F.Supp. 427 (S.D.N.Y.1973) for the proposition that plaintiff may not bring this action. *Texas Consumer Finance* did not involve the question of the retention and enforcement of an action under § 1123(b) or its predecessor. There the court merely held that a plan of arrangement could not "assign" causes of action for preference recoveries to a designee of a creditors' committee. The court specifically noted the assignee's lack of "statutory authority to sue." 365 F.Supp. at 430. This is not such an assignment, and there is here no such lack of statutory authority. Furthermore, the Sixth Circuit authority relied upon in *Texas Consumer Finance* for the proposition that a bankruptcy trustee's statutory right to recover preferences is non-assignable, *Belding-Hall Mfg. Co. v. Mercer & Ferdon Lumber Co.,* 175 Fed. 335 (6th Cir.1909), was decided before even the statutory

..

predecessor to § 1123(b) was enacted in 1938. *See* J. Moore and L. King, 6A *Collier on Bankruptcy* ¶ 10.22 at 108 (14th ed. 1977). It provides no relevant guidance here.

Similarly, *Woolsey Marine Industries, Inc. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)* 11 B.R. 930 (Bankr.E.D.N.Y. 1981) is distinguishable and inapposite authority. *Sapolin Paints* involved an attempt by a purchaser of the assets of a debtor to compel the debtor to bring suit after the sale of the assets, to avoid as a preference a security interest encumbering certain of the assets purchased. The court granted summary judgment against the purchaser, noting that the purchaser sought "not to increase the return to creditors or augment the distribution to them, but to increase the value of the assets which it, a stranger to the bankruptcy, has purchased from the trustee of the creditors." 11 B.R. at 938. As has been already adequately expressed, such is not the case here.[6]

One simple truth is evident—if plaintiff is not permitted to seek recovery of the alleged fraudulent conveyances here, there will be absolutely *no* benefit to the unsecured creditors whose claims were impaired under the Modified Plan. Defendants will receive a windfall. In contrast, permitting plaintiff to pursue these actions as a § 1123(b) representative will clearly (if indirectly) augment, and render more secure, the value of the distribution to those creditors under the plan. Defendants' motion to dismiss upon the grounds asserted will be denied.

6. The court in *Sapolin Paints* cited *Whiteford Plastics Co., Inc. v. Chase National Bank of New York City,* 179 F.2d 582 (2d Cir.1950) for the proposition that "[i]n an analogous situation, the Second Circuit has held that where no benefit to the estate will result, a debtor-in-possession may not exercise the avoidance powers of a trustee." 11 B.R. at 937.

In *Whiteford* the debtor sought to void a lien on two steam generators following confirmation of a plan of arrangement. The value of the generators was not incorporated into the plan of arrangement. The court refused to void the lien, finding the petition to avoid "not in the interest of the general creditors" and concluding that the debtor sought avoidance "purely for its own benefit." 179 F.2d at 584. The court further stated that "the creditors have received cash *or stock* for their claims, and there is no reason to safeguard their rights further." *Id.* (emphasis supplied). To the extent that this last statement might be interpreted to be at variance with the conclusions expressed in *Centennial Industries, supra,* or by this court above, this court would disagree.

Furthermore, this court notes that *Whiteford* was decided before the enactment of § 1123(b) in its current form.