**In re TRANS WORLD AIRLINES, INC., Debtor.**

**TRANS WORLD AIRLINES, INC., Plaintiff,**

v.

**TRAVELLERS INTERNATIONAL AG., et al., Defendants.**

Bankruptcy No. 92–115.
Adv. No. A–92–28.

United States Bankruptcy Court, D. Delaware.

Feb. 10, 1994.

Kenneth J. Nachbar, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, David S. Kurtz, Michael J. Templeton, Jones, Day, Reavis & Pogue, New York City, for Trans World Airlines, Inc.

Laura Davis Jones, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Chapman & Cutler, Chicago, IL, for Official Unsecured Creditors' Committee.

Laurie Selber Silverstein, Potter, Anderson & Corroon, Wilmington, DE, Richard A. Kirby, Dyer, Ellis, Joseph & Mills, Washington, DC, for Travellers Intern. AG.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

### INTRODUCTION

Before the court is a motion by the defendant Travellers International AG. ("Travellers") to dismiss both counts of an adversary complaint brought by the debtor, Trans World Airlines, Inc. ("TWA"). By its complaint, TWA seeks a declaration that a $13,693,100.42 deposit which it made pre-petition was a preferential transfer under Section 547 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.[1] The second count of the complaint seeks a declaration that the deposit is property of the estate subject to turnover pursuant to § 542(a). By its motion, Travellers seeks dismissal on the grounds that (a) the claims have been transferred to a third party without standing to prosecute, and (b) any recovery on the claims will not benefit creditors.

---

1. All references herein to sections of Title 11 of U.S.C. will be "§ __."

The court has jurisdiction pursuant to 28 U.S.C. § 1334 and § 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(E) and (F).

While the motion was filed pursuant to Fed.R.Civ.P. 12(b)(6) (Fed.R.Bankr.P. 7012), because matters outside the pleadings were considered by the court, the motion is treated as one for summary judgment.

With respect to the matters raised by the motion, there are no genuine issues of material fact. The parties are in dispute only as to the legal inferences to be drawn from the facts. Consequently, the motion is appropriate for disposition by summary judgment. Because I conclude that the claims have not been transferred to a third party and that any recovery on the claims will benefit creditors, I will deny the motion.

### FACTS

TWA filed its Chapter 11 petition on January 31, 1992. It commenced this adversary proceeding on March 10, 1992 (the "Adversary Proceeding"). On June 23, 1992, the Court authorized the Official Unsecured Creditors Committee (the "Committee") to intervene as a party plaintiff. TWA served as debtor-in-possession ("DIP") during the entire case, and its second amended plan of reorganization (the "Plan") was confirmed on August 12, 1993, effective November 3, 1993. Trial of the Adversary Proceeding is scheduled to commence shortly.

Prior to TWA's Chapter 11 case, Travellers filed a breach of contract action against TWA in a Missouri state court. The case was removed and transferred to the United States District Court for the Southern District of New York. On October 22, 1991, the action resulted in a judgment against TWA and in favor of Travellers in the amount of $12,336,127, plus interest. On October 31, 1991, TWA and Travellers entered into a "Stipulation and Order on Consent" (the "Stipulation") which continued the Fed. R.Civ.P. 62(a) stay of execution of judgment until November 4, 1991. The Stipulation provided that by November 4, 1991, TWA could either post a supersedeas bond in the amount of $13,693,101, or deposit that amount of cash with the clerk of the court. According to the Stipulation, the bond or cash would serve as security for TWA's payment of the judgment and interest. Travellers agreed that, upon the posting of the bond or cash, execution upon the judgment would be stayed during the pendency of TWA's appeal. On November 4, 1991, TWA deposited $13,693,101 with the clerk of the court. The appeal is still pending.

By the Adversary Proceeding, pursuant to §§ 547 and 550, TWA seeks to avoid and recover the cash deposit as a preferential transfer made to Travellers.[2] In the alternative, pursuant to § 542(a), TWA seeks to obtain turnover of the funds alleged to belong to the estate.[3] Travellers denies the

---

**2.** Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition; or
(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.
Section 550(a) provides:
Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.

**3.** Section 542(a) provides:
Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease

essential allegations of the complaint. The parties have conducted extensive pre-trial discovery and have filed a number of pre-trial motions.

On January 11, 1994, Travellers filed a Fed.R.Civ.P. 12(b)(6) (Fed.R.Bankr.P. 7012) motion to dismiss both counts of the complaint. As to the filing of the motion on the eve of trial, Travellers asserts that "grounds for this motion have arisen only since November 3, 1993, the effective date of TWA's reorganization plan." The basis for Travellers' motion is that (a) the complaint claims have been effectively transferred to a third party who lacks standing to prosecute them, and (b) any recovery on the claims will not benefit any creditor of the estate.

Specifically, Travellers claims that by reason of the terms of the Comprehensive Settlement Agreement ("CSA") approved by this court on December 30, 1992, the claims have been effectively transferred to Carl Icahn ("Icahn") and Icahn is the real party in interest.[4] Since § 547(b) permits only a trustee or DIP to bring a preference action, Travellers argues that Icahn has no standing to pursue the action. Furthermore, according to Travellers, only Icahn stands to benefit should TWA prevail on its complaint and the action should therefore be dismissed as not benefitting the estate as required by § 550(a). TWA's responds by noting that the claims have not in fact been transferred and that TWA remains the real party in interest and by arguing that should TWA prevail in the matter, its creditors will benefit from the recovery.[5]

The CSA is a multi-party complex agreement which, *inter alia*, resolved multiple claims disputes, provided for pre- and post-confirmation financing for TWA, changed the management of TWA, and resolved major disputes with the PBGC and certain unions involved in the TWA case. Pursuant to the CSA, Icahn committed to make certain substantial loans to TWA. Specifically, he agreed to a $50 million interim loan, a $125 million receivables facility and a $85 million asset based facility. It is the asset based facility provision which forms the basis for Travellers' motion.

Pursuant to the asset based facility provision of the CSA, Icahn agreed to advance $85 million to TWA in exchange for secured notes. The major terms of the secured notes were to be as follows: two-year maturity, interest at 1% above prime, principal due at maturity, optional repayment at any time without premium or penalty, liens on certain aircraft and aircraft engines, and superpriority status pursuant to § 364(c)(1).[6] In addition, the CSA stated that the secured notes were to provide for mandatory prepayment as follows:

> In the event that TWA sells all or any portion of its interest in Worldspan, L.P., TWA will be required to prepay, without premium or penalty, the Term Notes in an amount equal to the lesser of one-third of the net proceeds of such sale or $22 million. In addition, any net recovery, up to $13 million, on the preference claim against Travellers International, AG. ("Travellers") in the adversary proceeding styled *Trans World Airlines, Inc. v. Travellers International AG.*, Adv.Pro. No. 1–92–28 (*In re Trans World Airlines, Inc.*) Case No. 92–115 (Bankr.D.Del.1992), in which TWA seeks to avoid a transfer for

---

under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

**4.** When the Chapter 11 case began, Icahn was the CEO of TWA and controlled TWA. Icahn's involvement in this matter is both in an individual capacity and through one or more affiliates. For convenience, Icahn and/or his affiliates will be collectively referred to as Icahn.

**5.** For convenience purposes herein, the court makes no distinction between the arguments of-

fered by TWA and those offered by the Committee. They will both be referenced as TWA's arguments.

**6.** Section 364(c)(1) provides:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expense of the kind specified in section 503(b) or 507(b) of this title;

the benefit of Travellers pursuant to a prepetition judgment Travellers obtained against TWA in the amount of $13,693,-101.42, will be applied if and when recovered, unless such claim is sold to an Icahn Entity.

Motion to Approve CSA at 15–16.

Following the Court's December 30, 1992 order approving the CSA, Icahn loaned $85 million to TWA and TWA issued the secured notes in accordance with the above-described terms. Thus, while the notes represent secured super priority obligations of TWA which will mature on January 7, 1995, TWA is nonetheless required to make principal prepayments in the event that prior to the maturity date it obtains funds as a result of (a) the disposition its interest in Worldspan, L.P. or (b) a recovery on its preference claim against Travellers.[7]

In its May 28, 1993 disclosure statement, TWA advised its creditors as to the consummation of the Icahn loan transactions, including the asset based facility. The disclosure statement summarized the terms pursuant to which TWA would be required to make prepayments on the secured notes, including prepayment out of any recovery on the preference action against Travellers. The disclosure statement also made the following representation regarding the CSA:

> Absent the global resolution of these issues or the availability of alternative financing, TWA would have remained immersed in issues with respect to the Underfunding Liabilities, might not have been able to propose the plan or any other reorganization Plan and may have been forced to cease operations and liquidate its assets.

TWA Disclosure Statement at 37.

In its August 12, 1993, Plan confirmation order, in reciting its finding of compliance with § 1129(a)(1), the Court found that, pursuant to § 1123(b)(3), the reorganized TWA retained the estate avoidance claims:[8]

> Pursuant to section 1123(b)(3) of the Bankruptcy Code, Section IV.F.1 of the Plan provides that, except as provided in the Comprehensive Settlement Agreement, the CSA Supplemental Agreement, or any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan or the Comprehensive Settlement Agreement, Reorganized TWA shall retain and may enforce any claims, rights and causes of action that TWA or its Estate may hold against any entity, including claims, rights and causes of action, whether pending, on the Effective Date, arising under sections 510, 542–550 or 553 of the Bankruptcy Code. Reorganized TWA or its successors may pursue such retained claims, rights or causes of action, as appropriate, in accordance with the best interests of Reorganized TWA.

Confirmation Order at 8.

Pursuant to the confirmation order, the Court retained jurisdiction after the effective date of the Plan to preside over and decide certain matters, including adversary proceedings pending on the effective date of the Plan.

## STANDING

■ Citing numerous authorities for the proposition that only a trustee or a DIP has standing to avoid a preference and that a trustee or a DIP may not sell, transfer, or assign its right to avoid a preference, Travellers argues that because virtually all of the proceeds of any recovery will go to Icahn, TWA and the Committee are only nominal parties to this action, and Icahn is the real party in interest. *See* Fed.R.Civ.P. 17(a); Fed.R.Bankr.P. 7017.[9] Thus, according to

---

**7.** I note that the mandatory prepayment applies only to a recovery on the preference claim, not the turnover claim. For this reason, and because Travellers offered no meaningful argument as to the turnover claim, I do not consider the motion as it applies to the turnover claim to be before me for determination at this time.

**8.** Section 1123(b)(3)(B) provides that a plan may provide for:

> the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any ... claim or interest [belonging to the debtor or estate].

**9.** Federal Rule of Civil Procedure 17 provides that "[e]very action shall be prosecuted in the name of the real party in interest". Fed.R.Civ.P. 17(a). Rule 17 is applicable in bankruptcy ad-

Travellers, for all practical purposes it is as though Icahn actually purchased the claim and is now prosecuting it. In further support of its position, Travellers alludes to the fact that the CSA provides for the possibility of the claim being transferred directly to Icahn.

■ As to the latter point, as noted by TWA, although the CSA permits TWA to assign the claim to Icahn, the fact is that the claim has not been assigned to Icahn or anyone else. Travellers' reliance on that provision of the CSA does not support its position that by reason of Fed.R.Civ.P. 17(a) Icahn is the real party in interest.

I address the balance of Travellers' argument that for all practical purposes TWA has effectively assigned the claim to Icahn in the following discussion of whether a recovery will benefit the unsecured creditors. Because I conclude that if there is a recovery, it will benefit the unsecured creditors, I find in favor of TWA on the standing issue.

### BENEFIT OF THE ESTATE

■ Section 547(b) provides that a trustee may avoid a preferential transfer. Of course, pursuant to § 1107(a), a DIP has all the rights and powers of a trustee.[10] Thus, TWA as a DIP has the right to avoid a preferential transfer. However, pursuant to § 550(a), in order for a trustee or a DIP to recover the preferentially transferred property, the recovery must be "for the benefit of the estate." According to Travellers, because substantially all the recovery will go to Icahn in partial payment of the secured notes, there is no benefit to the estate and, therefore, there is no right of recovery under § 550(a). In response, TWA argues that under the Plan TWA's general unsecured creditors received, in full satisfaction of their claims, a pro-rata share of $58,440,000 in principal amount of new seven-year notes and 3,365,000 shares of new preferred stock. TWA maintains that

the value of the shares held by the unsecured creditors will increase as the value of reorganized TWA increases, and if reorganized TWA is successful in its preference claim, the value of the company will be enhanced by $13 million. Moreover, pursuant to the CSA and the Plan, Icahn holds an allowed, super priority claim under § 364(c)(1) on account of the secured notes. The reorganized TWA is obligated to pay Icahn the full amount of the notes, regardless of the success of the preference claim. TWA thus argues that a successful prosecution of the preference claim will benefit TWA's creditors by allowing reorganized TWA to pay a portion of Icahn's superpriority claim with funds which otherwise would not be available. According to TWA, while the recovery will not be paid out in kind to general unsecured creditors, it will indirectly benefit them by enhancing the value of a company in which they now have debt claims and equity interests.

■ Whether unsecured creditors benefit from a preference action is determined on a case-by-case basis. *In re Tennessee Wheel & Rubber Co. (Tennessee Wheel & Rubber Co. v. Captron Corporate Air Fleet)*, 64 B.R. 721, 726 (Bankr.M.D.Tenn.1986), *aff'd* 75 B.R. 1 (M.D.Tenn.1987). TWA cites a number of cases in which the requisite benefit is broadly construed. *E.g., DuVoisin v. East Tennessee Equity, Ltd. (In re Southern Indus. Banking Corp.)*, 59 B.R. 638, 641 (Bankr.E.D.Tenn. 1986); *Comm. of Unsecured Creditors of Specialty Plastics v. Doemling*, 127 B.R. 945, 950 (W.D.Pa.), *aff'd* 952 F.2d 1391 (3d Cir. 1991); *In re Sweetwater (Citicorp Acceptance Co. v. Robinson)*, 884 F.2d 1323, 1327 (10th Cir.1989); *In re Rooster, Inc. (Rooster Inc. v. Raphael Roy, S.R.L.)*, 127 B.R. 560, 573 n. 15 (Bankr.E.D.Pa.1991); *Tennessee Wheel*, 64 B.R. at 725–26. In arguing for a more restrictive view of the requisite benefit, Travellers cites *In re Harstad (Harstad v. First Am. Bank)*, 155 B.R. 500, 511–12

---

versary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7017.

**10.** Section 1107(a) provides:
Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights,

other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3) and (4) of this title, of a trustee serving in a case under this chapter.

(Bankr.D.Minn.1993), *Wellman v. Wellman,* 933 F.2d 215, 218–19 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991), *In re Vintero Corp. (Vintero Corp. v. Corporacion Venezolana De Fomento),* 735 F.2d 740, 742 (2d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984), *In re Mortgageamerica Corp. (Am. Nat'l Bank of Austin v. Mortgageamerica Corp.),* 714 F.2d 1266, 1275–76 (5th Cir.1983), and other cases.

Travellers relies principally on *Harstad* and *Wellman.* TWA relies principally on *DuVoisin* and *Sweetwater.* A synopsis of those cases is appropriate, followed by an assessment of their relevance here.

(1) In *DuVoisin,* pursuant to the confirmed plan of reorganization, the debtor, a banking institution, was merged into a federally insured successor-in-interest. Certain assets of the debtor, including avoidance actions, were transferred to a liquidating trust and the trustee was charged with pursuing the actions pursuant to appropriate authorization under § 1123(b)(3)(B). All proceeds from the avoidance actions were to be paid to and retained by the successor-in-interest. The unsecured creditors received federally insured certificates of deposit and stock ownership rights in the successor-in-interest. A defendant in a fraudulent conveyance action moved to dismiss. While it is not clear whether the defendant specifically relied upon § 550(a), one of the bases for its motion to dismiss was that any recovery would not be distributed to creditors. In reliance upon a pre-Code decision, *In re Centennial Indus. (Centennial Indus. v. NCR Corp.),* 12 B.R. 99 (Bankr.S.D.N.Y.1981), the court denied the defendant's motion because it found that creditors would benefit indirectly by the enhanced value of the successor-in-interest.

> Clearly, to the extent that plaintiff's recovery of fraudulent transfers and preferences operates to increase the assets and financial health of the successor-in-interest, it also operates to proportionally increase the value of those ownership rights in the successor-in-interest which consti-

tute a portion of the unsecured creditors' distribution under the plan.

*DuVoisin,* 59 B.R. at 641.

> One simple truth is evident—if plaintiff is not permitted to seek recovery of the alleged fraudulent conveyances here, there will be absolutely *no* benefit to the unsecured creditors whose claims were impaired under the Modified Plan. Defendants will receive a windfall. In contrast, permitting plaintiff to pursue these actions as a §·1123(b) representative will clearly (if indirectly) augment, and render more secure, the value of the distribution to those creditors under the plan.

*Id.* at 643.

(2) In *Sweetwater,* the defendant sought to dismiss the avoidance action on the grounds that a trustee appointed to pursue avoidance actions was not a proper representative of the estate pursuant to § 1123(b)(3)(B). Under the debtors' plan, it was not in a position to pay administrative claims in cash on the effective date of the plan, so the administrative claimants agreed to a different treatment pursuant to § 1129(a)(9). Instead of cash payments, the administrative claimants accepted an interest equal to the allowed amount of their claims in a fund of cash and assets. The fund's assets included potential proceeds from the avoidance actions. If the proceeds from the avoidance actions produced more cash than the allowed amount of the administrative claims, the reorganized debtor would receive the excess. The trustee for the fund was charged with the responsibility of reducing the claims to cash and paying the administrative claims. The court concluded that "any recovery by [the trustee] will obviously benefit the estate's unsecured administrative creditors." *Sweetwater,* 884 F.2d at 1327. The court then found that the recovery would also benefit other unsecured creditors:

> Further, to the extent these avoidance actions have been used to satisfy the administrative claimants, who have priority over other unsecured creditors, the estate has more funds available to pay other unsecured creditors. And if [the trustee] realizes more cash from the fund's assets than the allowed amount of all the adminis-

trative claims, the remainder will go to the reorganized debtor who will then be in a better position to meet its financial commitments, if any, under the plan. Thus, any successful recovery by [the trustee] will clearly benefit Sweetwater's unsecured creditors.

*Id.* at 1327.

(3) In *Wellman,* under its plan of reorganization the debtor issued to three creditors non-recourse notes which were to be paid only out of the net recovery of a fraudulent conveyance action. The notes provided that the debtor had the absolute right to direct and control the avoidance action, including the right to abandon the action as he chose. Thus, if the debtor chose to abandon the avoidance action, he owed the creditors nothing more. Only if he pursued the action and obtained a recovery did he owe the creditors anything. The district court found, and the appellate court agreed, that because the notes precluded recovery by the creditors in the event the debtor failed to prosecute the avoidance action, the creditors would have accepted the plan without the non-recourse notes. The court also noted that the debtor, with the bankruptcy court's approval, distributed to himself certain surplus cash and property of substantial value—several times the sum necessary to meet the note obligations. The district court found, and the appellate court agreed, that the debtor executed the non-recourse promissory notes to the creditors in an attempt to create a claim in the estate so that he could obtain a surplus recovery for himself. The court found that the debtor lacked standing to pursue the actions because under the circumstances recovery would not benefit the estate.

(4) In *Harstad,* the court granted the creditor defendant's motion to dismiss a preference action on two grounds. The debtor had commenced the avoidance action after the plan of reorganization was confirmed. The court viewed § 1123(b)(3)(B) as requiring a specific and unequivocal retention provision in a plan and found that the plan did not do so. Consequently, it found that the post-confirmation debtor lacked standing to pursue the action. The court then held that the debtor's recovery on the preference action would not benefit creditors. The confirmed plan was a "pot" plan and the court concluded as follows:

> The plaintiffs' plan provides for a payment to creditors from a pot of money which will be unaffected by any preference recoveries. That payment will not increase if they were successful in recovering those preferences. Thus, any recovery would benefit only the plaintiff and not their estate or their creditors.

*Harstad,* 155 B.R. at 511. The court went on to criticize and reject the indirect benefit test applied by many courts, including specifically the court in *Tennessee Wheel.* (*Tennessee Wheel* is a case relied upon by TWA, and the *Tennessee Wheel* court specifically relied upon *DuVoisin.*) The *Harstad* court adopted a very narrow view of the § 550(a) benefit requirement.

> Beyond incorrectly focussing on feasibility, the *Tennessee Wheel* and other courts assume that any increase in wealth to the reorganized debtor will benefit the creditors. I do not agree. After all, the debtors, not committing recoveries to their creditors, are in no way obligated to segregate or even keep the recoveries. That is, once preferences are recovered, the debtors have sole unrestricted authority to dispose of the preference recovery. They can spend, invest or even burn the recoveries. These actions do not benefit creditors. Creditors must be meaningfully and measurably benefitted. The amorphous benefits the plaintiffs claim here do not and will not suffice.

*Harstad,* 155 B.R. at 512.

Travellers' reliance upon *Wellman* is not helpful to its position. Unlike the situation here, in *Wellman* the creditors' notes were non-recourse and the debtor had a right to abandon the claim. The court found that the creditors would have accepted the plan without the non-recourse notes and that the non-recourse notes were essentially a ruse used by the debtor to obtain a surplus recovery for himself.

While TWA's position finds some support in *Sweetwater,* Travellers correctly notes that

the case is decidedly different from the situation here because in *Sweetwater* there was a specific group of administrative claimants which would directly benefit from the recovery. I note, however, that the court in *Sweetwater* also concluded that the indirect benefit to unsecured creditors justified a denial of the defendant's motion to dismiss.

I find that *DuVoisin* squarely supports TWA's position. Travellers' principal response to *DuVoisin* is that the more recent *Harstad* decision rejected the "general benefit" analysis in favor of a requirement that in some fashion the recovery must be "committed" to the creditors and the "[c]reditors must be meaningfully and measurably benefitted." *Harstad,* 155 B.R. at 512.

■ Given the fact that *Harstad* involved a preference action filed after a "pot" plan was confirmed, the holding is understandable.[11] However, I do not accept the *Harstad* court's view that the § 550(a) benefit requirement is only satisfied by having the recovery committed to the creditors in a meaningful and measurable way. It is not clear from the *Harstad* court's holding that it would require a quantifiable distribution directly to creditors, although such a requirement seems to be implied.

■ Section 550(a) requires a benefit to the "estate," not to creditors. "Estate" is a broader term than "creditors." There is no requirement that an avoidance action recovery be distributed (or "committed") in whole or in part to creditors. Indeed, the Code clearly contemplates otherwise. Pursuant to § 541(a) an estate is created by the petition filing, and under § 541(a)(3) property of the estate includes property recovered in avoidance actions. Pursuant to § 363, the DIP

may use property of the estate either in the ordinary course of business, or, with the court's approval, outside the ordinary course of business.[12] Thus, the Code clearly contemplates the use of avoidance action recoveries in the operation of the business in a manner which only indirectly benefits creditors. I put this concept into context by posing the following questions:

(1) Would it benefit the estate if TWA had obtained a $13 million recovery in December 1992 and thereby reduced the amount it borrowed from Icahn in January 1993 by $13 million?

(2) Would it benefit the estate if TWA had obtained a recovery in the Adversary Proceeding and used the funds to buy an aircraft engine and gave Icahn a security interest in the engine for the secured notes?

(3) Would it benefit the estate if TWA had obtained a recovery in the Adversary Proceeding prior to the confirmation of the plan and spent the funds on plant, equipment and/or salaries?

(4) Would it benefit the estate if during the pendency of the case a bank lender agreed to advance $13 million to TWA secured solely by the recovery in the Adversary Proceeding?

(5) Would it benefit the estate if an independent bank advanced funds to TWA preconfirmation and secured the loan by, *inter alia,* TWA's recovery in the Adversary Proceeding?

I would answer each of the above questions in the affirmative and, for purposes of § 550(a), I find no meaningful distinction between the above listed scenarios and the proposed use of the recovery here as contem-

---

**11.** Nevertheless, as I view the "benefit of the estate" requirement of § 550(a), I would not eliminate the possibility of a reorganized debtor having the right to pursue an avoidance action following confirmation of a "pot" plan.

**12.** Section 363(b)(1) provides:

The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. Section 363(c)(1) provides:

If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

plated by the CSA. That the situation under consideration will occur post-confirmation, whereas some of the above recited scenarios occur pre-confirmation, is made irrelevant by reason of § 1123(b)(3)(B). As the court observed in *Rooster*:

> A number of courts have concluded that a debtor may recover a preference even after confirmation and even if the recovery will be retained by the debtor under the terms of the plan. *E.g. In re Enserv Co., Inc.*, 64 B.R. 519 (9th Cir. BAP 1986), *aff'd*, 813 F.2d 1230 (9th Cir.1987). This result follows: from the lack of any statutory provision limiting preferential recoveries to creditors; from the practical consideration that a court may not know at the time a proceeding is decided to whom its proceeds will flow; from the congressional desire to prevent a particular creditor from receiving more than that to which it is entitled; and, from a recognition that a willingness of a debtor-in-possession to fund a plan of reorganization with a guaranteed return to creditors may stem in part from the plan proponent's right under the plan to receive the proceeds from future successful litigation.

127 B.R. 560, 573 n. 15.

TWA argues, and I agree, that the unsecured creditors will benefit from the enhanced value of reorganized TWA by reason of being shareholders of the reorganized debtor. It is of little moment that the recovery may be immediately paid to Icahn. If a $13 million payment to Icahn does not come out of the recovery, then it will necessarily come out of other TWA assets. I also conclude that not only do the unsecured creditors benefit as shareholders, they benefit as noteholders. To the extent that the recovery will enhance the value of reorganized TWA, the noteholders, as well as other creditors of TWA, will benefit.[13]

While these benefits may not be "committed" to the creditors or be quantifiable as to them, the benefits are nevertheless· real. More importantly, the benefit to the estate is quantifiable, and the estate is the *focus* of § 550(a), not individual creditors. How, in any particular case, a recovery is used and whether any of it is distributed to creditors is a function of the conduct of the case and the negotiations of the plan of reorganization. The basic purpose of a recovery pursuant to § 550(a) is to enlarge the estate for the benefit of creditors. Any recovery by TWA here will do that. As to whether the benefit to the estate is "meaningful" as the *Harstad* court requires, I do not find such a requirement to be implicated by § 550(a). Theoretically, even if the net recovery (i.e., recovery after all costs associated with obtaining the recovery) is a small dollar amount, it is still a benefit to the estate which satisfies the requirement of § 550(a)[14].

It is worth noting that benefits to the estate were contemplated. when the CSA was implemented. In its December 30, 1992 order approving the CSA, the court specifically found that the essential components of the CSA, including the asset based facility (which provides for the prepayment to Icahn out of the preference recovery), were mutually interdependent and that the CSA was in the best interest of the estate. These findings were recited by the court as follows:

> The terms of the Comprehensive Settlement Agreement are fair, equitable, reasonable and in the *best interests* of TWA, its *estate* and creditors.

Order Approving CSA, at 3 [Emphasis added].

\*    \*    \*    \*    \*    \*

> *Each of the terms* of the Comprehensive Settlement Agreement, including, without limitation, (i) the Interim Loan, (ii) the Receivables Facility, (iii) *the Asset Based*

---

**13.** Travellers argues that the indirect benefit is speculative because TWA is a multi-billion dollar company whose securities cannot conceivably be affected by a $13 million recovery. There is nothing in the Code to support an argument that the size of the recovery relative to the size of the debtor should be considered in allowing preference actions.

**14.** As observed above (note 13), there is no minimum recovery condition in § 550(a).

*Facility*, (iv) the assumption of the Pension Plans by the Icahn Sponsor, (v) the establishment by TWA of the Settlement Trust and the issuance by TWA of the Settlement Notes, (vi) the surrender by Icahn and the Icahn Entities of all record and beneficial interest in any debt or equity securities of TWA, (vii) the releases granted by TWA, its subsidiaries, Icahn, the Icahn Entities, the Unions, the Official Committee and PBGC, and (viii) the granting of a priority in payment superior to all claims against TWA having a priority pursuant to, equivalent to, or subordinate to the priority afforded by section 364(c)(1) of the Bankruptcy Code for (y) all claims incurred in the ordinary course of TWA's business for accrued and unpaid wages and salaries (including payroll taxes thereto) with respect to employees of TWA and (z) all claims for taxes and similar charges, in each case for which officers or directors of TWA could be assessed personal liability, *are each integral and mutually interdependent components* of a compromise and settlement within the meaning of Bankruptcy Rule 9019(a).

*Id.* at 4–5 [Emphasis added].

\* \* \* \* \* \*

Good cause has been shown for the approval of the Interim Loan, the Receivables Facility and the *Asset Based Facility.* Among other things, such financings are *critical to the continued operation of TWA's business and* the ability of TWA to propose *a feasible plan of reorganization.* Such financings or cash infusions reflect sound and prudent business judgment on the part of TWA. The terms of the financings and cash infusions authorized hereby are reasonable under the circumstances and in the best interests of TWA and its creditors.

*Id.* at 6–7 [Emphasis added]. Consistent with the court's findings, in its opening brief on its motion, Travellers acknowledges that the CSA served as the "framework" for the Plan and further characterized it as the "cornerstone" of the Plan.

In light of the benefit of the recovery to the reorganized TWA as clearly demonstrated, as found by the court in its December 30, 1992 order, and as acknowledged by Travellers in its motion papers, I find that the creditors will benefit, albeit indirectly, from any recovery and that this benefit satisfies the requirement of § 550(a). In adopting what may be characterized as a broad view of the benefit requirement in § 550(a), I agree with the courts in *DuVoisin* and *Tennessee Wheel* and disagree with the court in *Harstad,* even if *Harstad* is to be read as not necessarily requiring a direct distribution of the recovery to creditors.

One final point is worth noting. The Icahn secured notes mature in January 1995. It is conceivable that even if the Adversary Proceeding is tried very shortly and even if the court were to immediately render a judgment favorable to TWA, it is not at all clear that the judgment would not be appealed and be stayed pending appeal. There might be no prepayment of the secured notes if the secured notes are paid at maturity in January 1995 while the recovery on the Adversary Proceeding is still pending. Under that scenario, Travellers' position is eviscerated.

## CONCLUSION

If TWA is successful on the merits of its preference claim against Travellers, the $13,693,100 deposit will be returned to the reorganized TWA, not to any third party. Applying $13 million of the recovery to a mandatory prepayment to Icahn on the secured notes would be a use of corporate funds in the interest of creditors. The realization of a recovery by the reorganized TWA will benefit creditors as contemplated by § 550(a) and § 1123(b)(3)(B). Consequently, Travellers' motion to dismiss the preference claim is denied.

## ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date and pursuant to Bankruptcy Rule 9021, the motion (Doc. # 70) of defendant Travellers Interna-

tional AG. to dismiss the complaint is denied as to count one of the complaint.